**William M. MICHINI and Anthony J. Barbera, Jr.**

v.

**Joseph R. RIZZO et al.**

**Civ. A. No. 73–1995.**

United States District Court, E. D. Pennsylvania.

July 9, 1974.

Richard Z. Freemann, Jr., Michael Lehr, Philadelphia, Pa., for plaintiffs.

John Mattioni, James M. Penny, Jr., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

█ In Stull v. School Board of Western Beaver Jr.-Sr. H.S., 459 F.2d 339 (3d Cir. 1972), the Court of Appeals held that the right of an individual to control his personal appearance, including his hairstyle, was sufficiently substantial to be accorded the protection of the liberty assurance of the Due Process Clause of the Fourteenth Amendment. *Stull* involved a school dress code proscribing the wearing of hair covering the ears and below the collar line. However, the *Stull* court, following the lead of Gere v. Stanley, 453 F.2d 205 (3d Cir. 1971), another school dress code case, also held that the protected right was not absolute, and that it was necessary that the Court assess the reasonableness of the regulation in relation to its object and balance the right sought to be protected against the legitimate but countervailing interests of the community.[1] That balancing test is central to decision of the case before us, which presents the question whether a municipal fire department can justify an infringement upon the constitutionally protected right of a fireman to control his own hairstyle and appearance. In the *Stull* and *Gere* cases, the justification asserted by the authorities was principally that of decorum and discipline in the ambience of the classroom and the schoolyard. In the present case the community interests asserted are those of safety, the integrity of the fire department as a "paramilitary" organization, and good grooming for public appearance's sake.[2]

The plaintiffs are two former Philadelphia firemen who were discharged for noncompliance with Directive 13 of the Philadelphia Fire Department (Department), a regulation which prescribes the length and neatness of hair at the front, back, and sides of the head. They have sued under the Civil Rights Act, 42 U.S.C. § 1983, seeking an injunction against enforcement of Directive 13 against them and a declaration that the regulation is unconstitutional on its face and as applied, together with reinstatement, back pay, and counsel fees. Named as defendants are Joseph R. Rizzo, the Philadelphia Fire Commissioner, Hillel S. Levinson, the City's Managing Director,[3] and the City of Philadelphia.

---

1. Federal jurisdiction over such cases is conferred in 28 U.S.C. § 1343(3). *See* Gere v. Stanley, 453 F.2d 205, 207–208 (3d Cir. 1971).

2. In the *Stull* case, the school board asserted that the wearing of long hair might pose a safety hazard in the shop course. Although the Court did not evaluate the testimony in that regard because of the absence of findings by the District Judge, it noted that the

evidence which was developed on the subject, if credited, might well justify the enforcement of regulations pertaining to the length or management of hair as a condition of taking shop courses.

3. Under the Philadelphia Home Rule Charter § 5–100, the Managing Director is responsible for supervision of the activities of the Fire Department.

Trial on the merits was consolidated with the hearing of the application for a preliminary injunction as authorized by F.R.Civ.P. 65(a)(2). The taking of testimony lasted five days, during which the court heard from the plaintiffs, several Department officials including defendant Rizzo himself, and expert witnesses offered by both sides. The expert testimony, as well as much of the lay testimony, focused on the potential safety hazard presented by the wearing of facial hair or long hair by firemen, with particular emphasis on the effect of facial hair and long hair upon the safe use of the Scott Air Pak self-contained breathing apparatus. In this Opinion we set forth and discuss our findings of fact and conclusions of law.

## II. *Findings of Fact*

### A. *Directive 13*

Prior to August 26, 1968, the Department had no written appearance regulations.[4] On that date, Assistant Chief Ralph Kress issued a short memorandum to the divisional chiefs regarding personal appearance which was superseded by a series of written orders culminating in Directive 13.[5] Directive 13 reads as follows:

SUBJECT: PERSONAL APPEAR-
ANCE

### I. POLICY

A. This directive is disseminated in order to ensure a neat personal appearance that does not interfere with nor detract from the safe and proper wearing of uniforms and equipment.

### II. APPEARANCE STANDARDS

#### A. HAIRCUTS

1. Members will have their hair properly cut and neatly trimmed on the sides.

2. Hair at the back of the neck will be kept trimmed in an even and tapered fashion.

3. Hair on top of the head will not be overly long and will be combed or brushed in such a manner that it will remain clear of the forehead. It will not protrude from under the band of the cap or helmet.

4. Bush, Afro, Natural, Freedom or other similar styles will be worn in moderation.

a. If hair is combed, picked, blown, or teased, it will not exceed 1½″ in height, nor protrude from under the band of the cap or helmet at the front or sides.

b. Hair at the back of the neck will be kept trimmed in an even and tapered fashion.

5. The attached illustrations will be used as a guideline.

#### B. FACIAL HAIR

1. Members will be clean shaven.

2. Moustaches will be permitted, but must conform to the following provisions:

a. Moustaches will be kept neat and closely trimmed.

b. Moustaches will not extend beyond the corners of the mouth or below the upper lip.

---

4. However, Commissioner Rizzo testified that there had been unwritten appearance standards for as long as he had been in the Department, containing a general requirement of neatness and good grooming, including relatively short hair and prohibitions against sideburns and moustaches.

5. Directive 13 succeeded General Order 4 which was the regulation at issue in the case of Black v. Rizzo, 360 F.Supp. 648 (E.D.Pa.1973) discussed infra. The regulations are similar in character. On July 30, 1973, after the plaintiffs were suspended but before they were dismissed, the Department issued a revised Directive 13 which contained a more detailed policy statement than its predecessors. However, the substantive provisions of Directive 13 and Revised Directive 13 are virtually the same. We address the original Directive 13 as the significant document in this case, because that was the regulation under which plaintiffs were suspended and ultimately dismissed.

c. Moustaches will be trimmed in such a manner as to leave the upper lip visible.

3. Beards or goatees will not be permitted.

4. The attached illustrations will be used as a guideline.

C. SIDEBURNS

1. Sideburns will be kept neatly trimmed and close to the face.

2. Sideburns will not extend below the middle of the ear.

3. The attached illustrations will be used as a guideline.

BY ORDER OF JOSEPH R. RIZZO, FIRE COMMISSIONER
DIRECTIVE 13

Attached to Directive 13 are six photographs, depicting front, side, and back views of a black and a white fireman with hairstyles which are incorporated by reference "as a guideline" and which depict the acceptable appearance of a fireman's hair.[6] Commissioner Rizzo, Personnel Officer McNulty, and Capt. Kenney, the Department's safety officer, all agreed that Directive 13 is imprecise without reference to the photographs. The photographs clarify uncertain terms in the regulation: the photographs indicate what is not "overly long" (although the regulation is already specific as to hair height), what constitutes a "moderate" afro, and also how the hair at the back of the neck is to be trimmed in an even and tapered fashion (showing a space between the bottom of the hair and the collar line). While the photographs also clearly depict the appropriate trimming of the sideburns, we note

that the directive is quite specific as to the acceptable length thereof—proscribing growth below the midpoint of the ear.

There was also testimony by defense witnesses that the photographs do not set the outer limit of hair length, and we so find. For instance, Deputy Chief Miller, who was present in court throughout the proceedings, had longer hair on top than the officers in the photographs, and most officers and representatives of the Department who testified agreed that the manner in which a fireman's hair was combed was a crucial consideration in deciding whether a fireman was in compliance with Directive 13. However, despite certain conflicting interpretations of the regulation,[7] we also find that firemen whose hair was found to be in noncompliance with the regulation were informed of that fact repeatedly before disciplinary measures were taken, and were also given repeated opportunities to have their hair cut to bring it into compliance.

The evidence on the subject of the purpose of Directive 13 had several facets. There can be no doubt that Commissioner Rizzo believes that the Directive serves a useful purpose in engendering paramilitary discipline, and that he also believes that it fosters good grooming and that good grooming enhances public confidence in the Department. We find however that these were but secondary purposes of the Directive, and that the primary purpose of the Directive was to foster safety, particularly the safe use of the Scott Pak self-contained breathing apparatus and resuscitator and to prevent the ignition or snagging of hair on the back of the neck

6. The photographs are attached as an Appendix to this Opinion.

7. Battalion Chief Brown testified that Section II. A. 2. relates to the hair on the back of the neck between the ears and does not specify the hair length. He interpreted the words "in an even and tapered fashion" to mean "the hair line would taper down and . . . gradually thin out", referring specifically and only to hair thickness. Assist-

ant Chief Bowen testified that "tapered" means shaped like a wedge, going from thickness down to a tapered end, being triangular in shape. On the other hand, Commissioner Rizzo testified that "tapered" means that the hair at the back of the neck should not be shaped in a box fashion, and Battalion Chief Black testified that his interpretation of Section II. A. 2. was that there must be an "area of clearance between the collar and where the actual hair starts."

during firefighting operations. Consistent with this finding is the fact that the civilian employees of the Department are not subject to hair regulations. There are 81 male civilian employees within the Department who are not subject to any dress or hair code.

It is undisputed that both plaintiffs were at all times relevant hereto in substantial violation of the Directive in terms of the length of their hair on the sides and back, the length and style of their sideburns, the length of the hair on top of Michini's head, and the length of Michini's moustache. Both plaintiffs were dismissed solely because of the length of their hair (including Michini's moustache).[8]

### B. The Nature of Plaintiffs' Claims

During the course of their testimony, plaintiffs sought to invoke three constitutional bases for their claims: (1) the right to control their personal appearance recognized in *Stull*; (2) the principle of unconstitutional vagueness; and (3) First Amendment free speech protection. We recognize that the first two principles are issues in the case, but we must summarize the testimony of the plaintiffs which bears on the validity of the latter claim.

Michini testified that his hair expresses his own image of himself:

> I identify with today's society. I had my hair long and I had my hair short. I know I am much happier, more productive and more virile man with a hair this style than when it was shorter.

Michini described himself as a "liberal identifying with today's ideals," and asserted that his hair expresses to others his opposition to what he describes as the "hard hat" or "1984 philosophy of restricting the freedom of spirit and choice." He testified that he has a God-given right to be who he is and who he thinks he can be, and that in order for him to find his God he must have an "image of himself that he can carry with him." He believes that if he is needlessly forced to change one of the parts of his being (i. e., his hair), all of him is changed and he is made to feel that he is answering to a god other than his God. The result is that when he looks in a mirror he sees not a strong and virile self, but a weak and little person, "sort of the Samson thing." However, Michini testified that he also wants to project and express his political and social outlook to others so that just looking at him will help them make a judgment about what kind of person he is.

Although the foregoing summary reflects plaintiffs' efforts to make this into a First Amendment case, Michini conceded that he does not consider his hairstyle to represent a means of persuasion or communication to others, or of expressing any idea except his own image of himself. To the extent that Michini's testimony represents an effort to convince the Court that his hairstyle is a means of expression in the First Amendment sense, we are not persuaded. We do accept his claim however as the assertion of the right to control his personal appearance in the sense described in *Stull*. Michini's claim is best put in his own words: "Socially, I just want to fit in with my peers." We make the same findings with respect to Barbera notwithstanding his testimony that his hairstyle identifies him with the "actions of the younger generation" and that it conveys to others his liberal views on war, Watergate, and civil rights.[9] In short, we find that while the First Amendment question is an interesting one, plaintiffs in this case have failed to prove that their wearing of

---

8. No objection was ever made as to the cleanliness of either plaintiff's hair, nor did the length and style thereof ever cause a disturbance. *Cf.* Gere v. Stanley, *supra*.

9. We find Barbera's claim essentially to be that long hair is "fashionable" and that it makes him "feel good."

long hair has sufficient communicative content to bring it within the ambit of "symbolic speech" which is entitled to constitutional protection. *See* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

## C. *The Safety Justification for the Directive*

### 1. *Interference with the Scott Air Pak*

The Scott Air Pak is the brand of self-contained breathing apparatus used by the Department. Firemen of all ranks and on all types of firefighting assignments are called upon to wear the Scott Air Pak.[10] The Scott Pak primarily protects the wearer from breathing particles and noxious or superheated gases, and can also protect against facial burns from solid objects or liquids. The basic components of the apparatus are a face mask, air hose, and air tank. The purpose of the face piece is to seal off the wearer's face from the fireground atmosphere. The Scott Paks in use by the Department operate on what is called a demand system; *i. e.,* air flows from the tank into the mask only when the fireman inhales. The Scott Pak fulfills its function only when the fireman

achieves an adequate face piece seal; otherwise deadly or hot gases and particulate matter from the atmosphere can penetrate the mask, potentially interfering with efficiency or causing injury or death. The test prescribed by the manufacturers of the Scott Pak, and used by the Department, to determine whether a fireman has obtained an adequate seal is for the wearer to block off the air hose with his hand, inhale deeply, and watch for the mask to flatten toward his face due to the vacuum. If it does, an adequate seal exists; if not, air is leaking into the mask through the seal and the mask must be adjusted on the face to improve the seal.

The effect of beards and sideburns upon the face mask seal has been considered by the American National Standards Institute (ANSI), the nation's leading body on the subject of safety standards. ANSI Standard # Z88.5(7.5) and its predecessor provide that:

> Devices shall not be worn when physical conditions prevent a good face seal. Such conditions are a growth of beard, sideburns, unusual facial contours, a skull cap that projects under the face piece.

The defendants' expert safety witness [11] was Carl W. Irwin, a neurosurgeon.[12] Dr. Irwin testified that

---

10. The Department normally assigns four Scott Air Paks to each company containing approximately seven men. The Scott Air Paks assigned to each company are rotated among the men.

11. We start with the defendants' evidence because once the plaintiffs prove infringement on a constitutionally protected right, as they have here, the burden shifts to the defendants to persuade the Court that the safety justification is substantial and that it is weighty enough to overbalance the firemen's competing interest in their right to choose their own hair style and length. *See* Stradley v. Andersen, 478 F.2d 188 (8th Cir. 1973); Hunt v. Board of Fire Commissioners, 68 Misc.2d 261, 327 N.Y.S.2d 36 (Sup. Ct. Nassau County 1971) (concluding after a survey of over 50 hair cases that this rule carries the weight of authority); Breen v.

Kahl, 419 F.2d 1034 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L. Ed.2d 268 (1970) (state bears a "substantial burden of justification").

12. Dr. Irwin has been involved with firefighting since 1933 and has actually used the Scott Air Pak on the fireground. He has been surgeon for the Maine Fire Chief's Association and the New England Division of the International Association of Fire Chiefs since 1951, and for the New England Fire Chiefs Association since 1960. He was formerly the Deputy Director of Public Safety for Bangor, Maine, and Assistant Chief for Fire Services of Maine's Civil Defense organization. Dr. Irwin has been a member of the medical advisory group of the International Association of Fire Fighters and has participated in two of their occupational health conferences, one as chairman

sideburns longer than permitted by Directive 13 can impair the effectiveness and safe use of the Scott Air Pak since the sideburns artificially add a deviation from normal facial contours and prevent mask-to-skin contact in the area where the mask must seal. Thus sideburns growing in the area of the face mask seal increase the likelihood of mask leakage. The same problem is encountered by a fireman with a beard or with long hair combed over the forehead so as to interfere with the seal.

Plaintiffs' expert witness was Dr. Harvey . P. Utech.[13] Dr. Utech agreed with Dr. Irwin that beards or sideburns growing into the seal area can impair the effectiveness and safe use of the Scott Air Pak. Accordingly, we have no difficulty in finding that the wearing of beards or sideburns or long hair in front worn in the area of the face piece seal presents a safety hazard to firemen.[14]

2. *The Pressure Demand System as an Alternative*

The principal thrust of Dr. Utech's testimony was that the Philadelphia Fire Department is not using the latest and safest self-contained breathing equipment, and that the latest equipment would be substantially safer for a long-haired or bearded fireman to use than the system presently in use. The newer system is a Scott Air Pak which delivers air on a pressure-demand system. This device is basically the same as the older system except that it incorporates an air valve which continually maintains a positive air pressure inside the mask. The safety of the pressure-demand system lies in the fact that in the event of a leak in the face piece seal, air is forced outward through the leak, thus preventing entry into the mask of gases or particles from outside. Dr. Utech testified that the pressure-demand system provides a significantly greater degree of protection from the dangers of inboard leakage than that provided by the demand system. He supported this conclusion by reference to various studies.[15] He also testified that the pressure-demand system is not used by any fire department in the country.

Dr. Irwin was also familiar with the pressure-demand system. He agreed

of the panel on protective equipment, and the other as chairman of the panel on training of firefighters. Dr. Irwin was the first chairman of the medical advisory committee of the International Association of Fire Chiefs and an original member of the subcommittee on protective clothing and equipment for firefighters of the National Fire Protection Association. Finally, Dr. Irwin is the National Fire Protection representative on the ANSI committee which deals with respiratory protection, and is chairman of the ANSI subcommittee on respiratory protection equipment in the field.

13. Dr. Utech's doctorate is in metallurgical engineering. He joined the National Bureau of Standards (NBS), a scientific agency of the Department of Commerce, on a postdoctoral fellowship program. He worked first in the Metallurgy Division but in 1970 transferred to a new NBS program involving fires. Dr. Utech has been in charge of a program to improve the equipment used by the nation's fire departments. The program was instituted .after NBS documented that firefighting is one of the most hazardous occupations in the United States, comparable in danger to police work and coal mining. Since that time Dr. Utech has been in charge of studies in this area, one aspect of which is protective equipment. Like Dr. Irwin, Dr. Utech has written and spoken in the field, attended conferences, and served on various committees.

14. The regulation of the length of moustaches is directed to use of the resuscitator for a fireman felled by gases on the fire grounds. A beard or a moustache not in compliance with Directive 13 will interfere with the safe use of the resuscitator. An improper seal of the resuscitator face piece can mean death by asphyxiation to a stricken fireman because of an inability to force oxygen into the man's lungs.

15. Experiments were performed for the Atomic Energy Commission under the direction of Edwin C. Hyatt at the Los Alamos Scientific Laboratory to determine the amount of face piece leakage in both the demand and the pressure-demand self-contained breathing apparatus. The 'Los Alamos study tested both the new and old style Scott Air Paks, using both the demand sys-

that, of two identical firemen confronted with a toxic atmosphere, the one using the pressure-demand system would be less likely to have inboard leakage than the one using the demand system. However, he also testified to serious disadvantages. Because of the outboard leakage of air when the seal is imperfect, the air supply carried by the fireman will last for a shorter period.[16] This could both reduce a firefighter's effectiveness by reducing the time he can fight the fire without leaving to replenish his air supply, and also endanger a fireman who is trapped inside a burning area and needs as much time as possible to increase his chance of escape. Dr. Irwin also pointed out that with the pressure-demand system, the air supply must be shut off during any period of nonuse, since otherwise air will escape rapidly whenever the mask is removed. On the other hand, the demand type self-contained breathing apparatus does not release air when the mask is removed. This disadvantage to the pressure-demand system is exacerbated by the quite common necessity on the fireground to readjust the Scott Air Pak face mask either partially or completely.

Dr. Irwin testified that the loss of air when the mask is removed would occur only when the fireman forgot to shut off a valve, although firemen would be trained to close the valve, and that the mask generally would be removed only away from the fire scene. Dr. Utech agreed that firemen should be trained to use the equipment properly and opined that open mask leakage presented no real risk because a fireman will only remove his face mask when he is away from the fire scene. Dr. Utech further

stated that if the face piece became dislodged in the presence of toxic gases, the fireman with the pressure-demand system would be safer than an identical fireman with the demand system. The cost of converting a Scott Air Pak demand system to the pressure-demand system would be about $65 per unit, plus a few minutes' unskilled labor. The Department currently has approximately 485 Scott Air Paks, all on the demand system. We credit Dr. Irwin's testimony with respect to the disadvantages of the pressure demand system.

### 3. Use of a Wig as an Alternative

Both Michini and Barbera had attempted at times to cover up their long hair on the job by wearing wigs. During the trial they advanced the contention that the wearing of a wig would obviate any safety problems caused by long hair. To the contrary, we find that wigs create more safety problems than they alleviate. In order to take the Scott Pak mask off while wearing a wig, Barbera had to hold the wig in place with one hand resulting in a two-handed rather than what is normally a one-handed operation. In addition, Barbera could only remove the mask from the back rather than in the proper fashion of pulling the mask up and back from the front. When he attempted to remove the mask in proper fashion, he also pulled off the wig and dislodged the hair net. The mask is difficult to remove from the back while wearing gloves, which are required at all times on the fireground. The process for putting on a wig is complex and time consuming. It includes pinning up the hair, affixing and pinning a tight hair net, and don-

tem and the pressure-demand system, and disclosed that test subjects using both the old and new Scott Air Pak on the demand system (the Department uses the new Scott Pak) suffered a much greater incidence of inboard face leakage than that encountered with the pressure-demand system; in fact, with the demand system, leakage was sometimes in excess of what the Bureau of Standards has defined as a critical amount.

16. The normal demand type Scott Air Pak is designed to provide thirty minutes' supply of air, and has a warning device which signals the fireman when five minutes of air remain in his tank. The amount by which the period is shortened depends on the rate of leakage. Dr. Irwin estimated that loss might be at least five minutes out of thirty, although he was not certain as to the exact amount of time.

ning a tight-fitting wig over the hair and net. Michini testified that physical activity could dislodge the wig and cause hair to protrude without his knowledge. If the net is not properly fitted or stretches with age or the wig is old and becomes loose, the wig will not hold tightly to the head. If the hair, the net, and the wig are not all properly fixed and secured, the wearing of the face piece or helmet is affected. Avoidable adjustments to a Scott Pak mask may result in the loss of critical time. Michini testified to one incident where his wig caused difficulty with his Scott Pak resulting in interruption of his firefighting duties. He was carrying a woman out of a burning dwelling and paused to remove his Scott Pak mask, which took the wig with it. He then had to have another fireman remove the woman from the building while he replaced the wig. Thus we find the wig to be an unsatisfactory alternative to Directive 13.[17]

### 4. Burning of Long Hair on the Fireground

The facts found so far were not greatly in dispute. A real factual controversy is presented, however, by the question whether a fireman's long hair, even if it does not interfere with his Scott Pak, might present a burn hazard or a danger of being snagged. The plaintiffs suggested that any hazard would be obviated by wearing the helmet liner ear flaps down and the coat collar up, which would cover the hair. However, during the physical activity of firefighting, a coat collar could become turned down or a helmet knocked off. There was also evidence that, in warm weather, the firemen do not always wear their ear flaps down and coat collars up. Moreover, plaintiff Barbera demonstrated the wearing of collar up and helmet flaps down, and his hair protruded to both sides at the back of his head. We find that the helmet flaps and coat collar do not obviate the danger of hair by covering it at all times.[17a]

The defendants put on evidence from Commissioner Rizzo and Capt. Kenney, the Department's safety officer, and Dr. Irwin, that long hair exposed on the back of the neck is a safety hazard because hair burns. Commissioner Rizzo's opinion was based on his observations in 26 years of firefighting. Captain Kenney had found that hair clippings burned when he ignited them in a test at Department headquarters. Dr. Irwin also testified that if the exposed portion of the hair ignited it could burn up under the helmet. Dr. Utech and Dr. Irwin agreed that hair has essentially the same flammability characteristics as wool, which is relatively non-flammable but nevertheless does burn to a certain extent. Both Dr. Irwin and Commissioner Rizzo also testified, and we find, that hair burns more rapidly when it or the ambient air is hot. Dr. Utech testified that in an emergency situation a fireman's hair "may very well catch fire and burn away," although he also felt that in such a situation the fireman would be burned whether or not he had hair. Dr. Utech also testified that wool, which Dr. Irwin said "is" hair, is more flammable when fluffed up. There was no evidence of any tests or actual experiences tending to show that long hair is a fire hazard to firemen.[18] However, an

---

17. We note in passing that Commissioner Rizzo testified that the Department does permit bald firemen to wear wigs. Conceivably many of the difficulties of wearing a wig over a full head of hair are absent when the wig covers only bare skin.

17a. While early in the trial plaintiffs also made some reference to a "zero hood" as an alternative, they suddenly dropped this line of evidence and never argued that the Court should consider it. The zero hood is a cotton cap worn over the hair and ears with a chin-strap. Since plaintiffs did not develop the evidence on this subject, they did not sustain their burden of proving the efficacy and practicality of the zero hood as a less restrictive alternative to the hair regulation.

18. This could simply be a reflection of the paucity of longhaired firemen.

actual courtroom demonstration by Michini as part of his answer to a question shed some light on the matter.

On the first day of trial Michini was probed on cross-examination as to whether hair burns, and he repeatedly replied that it singes when exposed to flame, but does not continue to burn when the source of flame is removed. To illustrate his point he struck a match and briefly held it to his hair. Unbeknownst to Michini, his hair ignited and burned brightly for several seconds. Five fire officers in the courtroom, reacting reflexively to the call of duty, jumped to their feet and shouted at him to extinguish the flame, whereupon he reached up with his hand and did so. He quickly volunteered that his hair spray, not his hair, was the cause of the fire. Hair spray is commonly used by males these days, and the speed with which hair burns is accelerated if it is coated or impregnated with flammable substances such as hair spray. Viewing the testimony on the subject as a whole, we are persuaded that hair exposed at the back of the neck constitutes a hazard on the firegrounds.[19]

Turning to the question of alternatives, we note that, unlike the situation with respect to the use of the Scott Pak, there are some viable alternatives to the proscription of long hair at the back of the neck which could alleviate to a considerable extent the hazard of burning. These would include a ban on the use of hair spray by firemen and better training or other measures to insure that extra long hair is tucked in and that the men always wear their ear flaps down and collars up. However, we also note that these alternatives would not admit of easy enforcement and that, unlike the situation in *Stull,* what is at stake is not the safety of the individual seeking to wear long hair alone, but also the safety of others.

## III. *Discussion*

### A. *Introduction*

█ The parties have raised a number of legal issues which require discussion. They have also extended their briefs by discussing a number of legal issues which require only passing mention, and we will address these first. The defendants have raised questions of the jurisdiction of the Court, the plaintiffs' standing to sue, and their alleged failure to exhaust administrative remedies. These contentions represent an attempt to relitigate settled propositions of law. We find them to be without merit.[20] The defendants have also argued that plaintiffs have no constitutional right to control their appearance. To so hold would require us to overturn *Stull,* which we of course cannot do.

█ The plaintiffs contend that the First Amendment is involved in this case. In our findings of fact we noted that we were not persuaded by that portion of the testimony of Firemen Michini and Barbera which purported to equate their desire for a certain hair style with speech. Plaintiffs have contended in their brief that the plaintiffs'

19. This conclusion is buttressed by the brief testimony on the question of snagging. None of the witnesses could point to an instance where a fireman's hair had become snagged upon a foreign object at a fire scene, perhaps because of the paucity of long-haired firemen. It was agreed that long hair could be tucked under a collar; and it was not contended that hair of the length of that of either plaintiff could snag. On the other hand, it is not difficult to conceive that if a fireman wore his hair below shoulder length, snags might indeed occur.

20. The jurisdictional issue was settled in this circuit in Gere v. Stanley, see n. 1, *supra.* The standing to sue of the plaintiffs who have been discharged for failure to comply with the regulation is self-evident. There are no administrative remedies which they have not exhausted, *see* Comprehensive Group Health Services Board of Directors v. Temple University, 363 F.Supp. 1069, 1097–1098 (E.D.Pa.1973), nor is exhaustion required in a civil rights action, *see* King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L. Ed.2d 1118 (1968).

claim is a First Amendment claim as a matter of law. We disagree. The plaintiffs have, quite correctly, argued that symbolic as well as pure speech is afforded protection by the First Amendment. *See* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In Massie v. Henry, 455 F.2d 779 (4th Cir. 1972), the court, in a decision similar to *Stull,* recognized that hair might be communicative and thus entitled to First Amendment protection:

> Perhaps the length of one's hair may be symbolic speech which under some circumstances is entitled to the protection of the First Amendment.

And in Braxton v. Board of Public Instruction of Duval Co., Fla., 303 F.Supp. 958 (M.D.Fla.1967), the court held that a man who wears his beard "as an appropriate expression of his heritage, culture and racial pride as a black man" is entitled to First Amendment protection. However, the *Massie* court noted that the record did not establish that the plaintiff (a schoolboy) selected the length of his hair for any reason other than personal preference. That is what we have found here—two men who are concerned about their personal appearance: Michini wants to fit in with his peers and Barbera wants to be fashionable. Of course, we find this understandable, but still this gains them no First Amendment protection for their hair in addition to the *Stull* protection.

There is no kinship whatever between the claims of firemen Michini and Barbera and the high school students in *Tinker* who wore black arm bands to publicize their objections to the war in Vietnam or to the plaintiff in *Braxton,* who was asserting racial pride. While the Third Circuit has not yet addressed the question, the weight of authority is to the effect that the right to self-selection of hairstyle is not grounded in the First Amendment. *See, e. g.,* Richards v. Thurston, 424 F.2d 1281, 1283 (1st Cir. 1970); Karr v. Schmidt, 460 F.2d 609, 613–614 (5th Cir.) (en banc), cert. denied, 409 U.S. 989, 93 S.Ct. 307, 34 L. Ed.2d 256 (1972); Jackson v. Dorrier, 424 F.2d 213, 217 (6th Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed. 2d 88 (1970); Gfell v. Rickelman, 441 F.2d 444 (6th Cir. 1971); King v. Saddleback Junior College, 445 F.2d 932, 937 (9th Cir. 1971); Freeman v. Flake, 448 F.2d 258, 260–261 (10th Cir. 1971), cert. denied, 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972); and Fagan v. National Cash Register Co., 481 F.2d 1115, 1117–1119 (D.C. Cir. 1973). Several of these cases denied the First Amendment claim on the basis of a failure of the plaintiffs' proof of the symbolic significance of their long hair, rather than holding that as a matter of law hair can never have First Amendment protection. That is the conclusion we reach too. We need not decide whether long hair ever has First Amendment protection; we hold that on this record the plaintiffs' long hair does not.

Finally, we need not be detained by the dispute between the parties as to whether the right of plaintiffs to wear their hair as they choose is a so-called "fundamental right" which can be overridden only by a "compelling governmental interest,[21]" or whether it is a nonfundamental right which must defer to any regulation bearing a rational relationship to a legitimate governmental purpose.[22] For the plaintiffs have con-

21. *See, e. g.,* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (freedom of religion); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L. Ed.2d 480 (1959) (freedom of association); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1155 (1942) (right to procreation).

22. *See, e. g.,* Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

ceded that "safety, if proven, is a compelling governmental interest which would override plaintiffs' rights if Directive 13 does, indeed, promote safety" (Plaintiffs' Brief at 2), and it is the safety justification alone upon which we uphold the regulation. The limited focus of the opinion also obviates the need for discussing a number of the issues which the parties have addressed at length in their briefs, particularly the viability of the defendants' claim that the regulation can be justified on the basis of: (1) the need for discipline in a paramilitary setting, and (2) the need to present a well-groomed and uniform appearance or image to the public.

We turn then to a discussion of the remaining issues: (1) whether Directive 13 is unconstitutionally vague; (2) whether the defendants have established that Directive 13 is justified by consideration of safety; and (3) whether the defendants are barred from seeking to justify the Directive by the judgment in Black v. Rizzo, note 5, *supra*.

B. *Is Directive 13 Void for Vagueness?*

█ There is no dispute about the proposition that a statute which regulates human conduct is unconstitutional if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Zwickler v. Koota, 389 U.S. 241, 247, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).[23] The rationale for this rule was explained by Justice Frankfurter:

Fundamental fairness of course requires that people be given notice of what to avoid. If the purpose of a statute is undisclosed, if the legislature's will has not been revealed, it offends reason that punishment should be meted out for conduct which at the time of its commission was not forbidden to the understanding of those who wished to observe the law. The requirement of fair notice that there is a boundary of prohibited conduct not to be overstepped is included in the conception of "due process of law". Winters v. New York, 333 U.S. 507, 523, 68 S.Ct. 665, 674, 92 L.Ed. 480 (1948) (dissenting opinion).

A helpful recent exposition of the vagueness doctrine is found in Grayned v. City of Rockford, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed. 2d 222 (1972):

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment free-

23. It is, of course, of no consequence that what is attacked here is an administrative regulation. Administrative regulations, like statutes, must be so drafted that those persons who are affected by them can discern the line between proscribed and permitted conduct. Kraus & Bros. v. United States, 327 U.S. 614, 66 S.Ct. 705, 90 L.Ed. 894 (1946).

doms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."

(Footnotes omitted.)

However, a court examining an allegedly vague statute must not restrict its focus to the words of the statute only. The Supreme Court also noted in *Grayned* that a state court's narrowing interpretation of a state statute may supply the required specificity. The Court expanded on this proposition and relied on it in Parker v. Levy, —— U.S. ——, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), which upheld articles 133 and 134 of the Uniform Code of Military Justice, despite their unspecific language, because of the specific content given those provisions by years of judicial gloss supplied "by the United States Court of Military Appeals or by other military authorities." The Court went on to reject the respondent's void-for-vagueness claim on the ground that, because the Articles applied without question to *his* activities, he had no standing "to challenge the vagueness of these Articles as they might be hypothetically applied to the conduct of others." Suggesting that such standing might be appropriate in a freedom of expression context, because of the overbreadth and chilling effect overtones,[23a] the Court rejected standing because the free speech element was significantly attenuated by the military setting of the case. Finally, it noted that this was not a case involving vagueness " 'in the sense that no standard of conduct is specified at all,' " quoting from and distinguishing Coates v. City of Cincinnati, 402 U.S. 611, 614, 91

S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971), which struck down a city ordinance forbidding sidewalk gatherings "annoying" to passersby.

■ *Levy* controls disposition of the vagueness challenge here. Regardless of the difficulty of judging marginal hairstyles against the wording of the regulation, there is no question that the plaintiffs were not in compliance. Their hair covered part of their ears and was stylishly long in back. We have found that this is not a First Amendment case, and so under *Levy* we must deny plaintiffs' standing to raise the vagueness of Directive 13 as applied to others whose hair was marginally in compliance.

■ Furthermore, even if plaintiffs had standing to assert vagueness despite *Levy,* we would reject their vagueness attack because the policies underlying the vagueness doctrine do not require its application here, and because we find no suggestion that Directive 13 is so vague that it specifies no standard of conduct at all. Referring to the statement of those policies in Grayned v. City of Rockford, quoted *supra,* we make the following observations. First, the manner in which the Department implements Directive 13 meets the objection that vague laws "may trap the innocent by not providing fair warning." Offending firemen are not fired on the spot.[24] They are warned, or told to get a haircut, or suspended until they comply. Plaintiff Michini was placed on report, then suspended the same day, then notified of a hearing to be held six days later, which was rescheduled for six days later still; two days after the hearing he was notified of the Department's intention to fire him, followed ten days later by a notice of dismissal effective the next day. The manner of plaintiff

23a. However, one year earlier the Supreme Court espoused the same standing doctrine for a First Amendment overbreadth case. Broadrick v. Oklahoma, 413 U.S. 601, 93 S. Ct. 2908, 37 L.Ed.2d 830 (1973).

24. The Supreme Court seems to assume that a person facing loss of a job has as strong a

void-for-vagueness argument as one facing criminal prosecution, in United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

Barbera's dismissal was virtually the same. Thus, we feel both plaintiffs had fair warning that they were in violation of Directive 13 before they were made to suffer the consequences. *See* United States Civil Service Commission, *supra,* 413 U.S. at 578, 93 S.Ct. 2880; Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) [text accompanying note 25]; Jackson v. Dorrier, *supra,* 424 F.2d at 217–218. Secondly, we find no evidence that the allegedly vague standards of Directive 13 have been enforced in a selective and discriminatory manner. Thirdly, since this case does not involve First Amendment rights, it is irrelevant to this case that vague laws in the freedom of expression area tend to inhibit lawful expression close to the line because cautious citizens steer wider of the forbidden zone than required, with a resultant loss to the community of some of the benefits of wide-open, robust expression. Thus our policy analysis indicates that the dangers posed by vague laws are absent.

In addition, we do not find the wording of the regulation in question so vague that men of common intelligence, like plaintiffs, could not know its meaning. We have found that the Directive is clear as to the permissible length of moustaches and sideburns, and the permissible height of hair. We have here the unusual situation of a series of photographs illustrating the text of the Directive and clarifying any uncertainty in the text as to the permissible length of hair, the manner of cutting and tapering the sideburns and hair at the back of the neck, and in general illustrating what kind of hairstyle is required. As the Supreme Court observed in United States Civil Service Commission, *supra,* 413 U.S. at 575–577, 93 S. Ct. at 2897:

> There might be quibbles about the meaning of [certain terms in the regulations,] but there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those

intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. "[T]he general class of offenses to which . . . [the provisions are] directed is plainly within [their] terms, . . . [and they] will not ' be struck down as vague, even though marginal cases could be put where doubts might arise." United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954).

We find this language apt here. The plaintiffs' vagueness challenge to Directive 13 will be rejected.

C. *Have the Defendants Established That Directive 13 Is Justified by Considerations of Safety?*

Stull v. School Board of Western Beaver Jr.-Sr. High School, *supra,* establishes that the right to determine the length and style of one's hair, as one aspect of the right to control one's personal appearance, is implicit in the liberty assurance of the due process clause of the Fourteenth Amendment. *Stull* also establishes that legitimate community interests may outweigh the right, in which case the court must assess the reasonableness of the regulation in relation to its object; that is our task here. The *Stull* court noted that safety was a consideration which could justify the intrusion, but continued that safety measures would have to be limited so as not to overly burden the exercise of a protected right. For the reasons set forth at considerable length in our findings of fact, the defendants have met their burden of establishing a legitimate community interest which outweighs the right: the safety justification noted in *Stull.*

██ In approaching the matter of safety justification, we must consider the context. As Dr. Utech noted, firefighting is one of the most hazardous occupations in America. The hazards of firefighting are such that the issue of

safety *vel non* is measured in terms of not just cuts or bruises or even broken limbs, but rather serious burns, asphyxiation, and life itself. Moreover, the safety factor concerns not only the individual fireman, but also his fellow firefighters and others who may be trapped in a burning building, for to the extent that a given fireman is hindered in the performance of his duties, the risk to others (and to property) is increased. Accordingly, we cannot measure safety in relative terms. The officials in charge of the Department have a right —and a duty—to seek to achieve *maximum* safety. And, in terms of the *Stull* proviso, a less restrictive alternative which reduces the infringement of the constitutionally protected right but which is only a little less safe will not do. It must be equally safe to qualify.

In our findings of fact, we have noted that Directive 13 is directly related to the safe and efficient use of the Scott Air Pak mask, because long or full sideburns, hair combed down over the forehead, or beards will break the seal, and long moustaches can impair the effective use of the resuscitator. We have also found a risk of burning and snagging from long hair at the back and sides of the head. These findings are coextensive with the scope of the Directive·; hence they justify it unless the same end could be achieved with less curtailment of the *Stull* right. In other words, are there "less drastic means" or "less restrictive alternatives" to the regulation?[25]

The plaintiffs' approach to this aspect of the case has been couched not in terms of any proposal for redraft of the Directive, but rather in terms of its contention that the so-called pressure-demand Scott Air Pak apparatus is a suitable alternative to the demand system Scott Air Pak apparatus presently in use because it would allow the wearing of long hair without sacrificing safety. However, we have found that the pressure-demand system has several potential drawbacks, the most serious of which is that of providing less operating time than the demand system due to outboard leakage of air; the lost time could be critical to a fireman attempting to extricate himself from deep within a burning building. Moreover, we have noted that the pressure-demand system has never been used by any fire department anywhere. And we find that either system is safer when hair does not interfere with the seal than when it does. Hence, pressure-demand is not a suitable less restrictive alternative to the demand system presently in use.[26] For reasons indicated above, we also find that the wearing of a wig does not provide a satisfactory alternative either. While we have noted that there are some viable alternatives to the proscription of long hair at the back of the neck which could alleviate to a considerable extent the hazards of burning and snagging, we have also noted the limitations of such measures. In the present context it is not just the safety of the individual seeking to wear long hair alone (as in

25. *See* Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (voter residency law in issue put unnecessary burden on right to vote) ; Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 309, 38 L.Ed.2d 260 (1973) ("less drastic means" available to attain state interest in regulating primary elections without unnecessary burden on constitutionally protected freedom of association) ; Stull v. School Board of Western Beaver Jr.-Sr. H.S., 459 F.2d 339, 347 (3d Cir. 1972) (dicta saying potential safety devices must be "as limited as possible so as not to overly burden the exercise of a protected right," i. e. governance of hair length and style as implicit part of liberty assur-

ance of Fourteenth Amendment due process clause). *Cf.* Note, "Less Drastic Means and the First Amendment," 78 Yale L.J. 464 (1969).

26. Commissioner Rizzo testified that safety is the number one concern of his administration. Capt. Kenney, the Department's Safety Officer, testified that the Department was studying the pressure-demand system and would consider switching to it if it were proven in practice. We credit that testimony and trust that if and when pressure demand proves safer and more successful under fire than the demand system, the Department will implement its safety orientation by switching to it.

*Stull*) which is at stake, but also the lives and property of others. Finally, as we have noted, the officials of the Department have the duty to seek to achieve maximum safety; a little less safety will not do. Hence, we are not satisfied, at least on this record, that there are satisfactory alternatives to the regulation with respect to long hair at the back of the head.[27] In sum, we find that Directive 13 as a whole as well as in its component parts is justified by safety considerations which outweigh the plaintiffs' constitutional right to long hair.

Our conclusion that Directive 13 is justified by safety considerations is supported by the decision in Manco v. Town of Irvington, 126 N.J.Super. 148, 313 A. 2d 219 (App.Div.1973), aff'd mem., 64 N.J. 142, 313 A.2d 204 (1974). In *Manco*, the court was likewise confronted with a constitutional challenge to a fire department directive concerning the length and style of hair which read in part:

> Because of safety standards it becomes incumbent upon us to adhere to good safety procedures and it becomes the responsibility of all officers and members of the department to practice simple safety standards to the effect that sideburns because of the safety feature extend to the lower ear lobe, be parallel to each other and closely (not bushy) trimmed. In line with the same safety practices, the hairline shall not extend below the collar of one's shirt or uniform. . . . [r]espirators shall not be worn when conditions prevent a good face seal. . . . Such conditions may be a growth of beard, sideburns . . . .

In *Manco*, defendants' expert testimony was that gas masks would not properly seal over plaintiff's face because of his hairstyle. Plaintiff's expert testified that he had tested the mask on plaintiff and on plaintiff's attorney, whose hair

was longer than plaintiff's, and that it was his opinion that the gas mask would safely seal on them. The Appellate Division upheld the regulation, stating:

> It is apparent that there was a sharp dispute among the experts as to the reasonableness of the regulation. In our view, the record amply supports the trial court's conclusion that safety factors warranted its adoption and that it was, in fact, violated.

We turn then to plaintiffs' final arguments concerning *res judicata* and collateral estoppel.

D. *Are the Defendants Barred by the Doctrines of Collateral Estoppel or Res Judicata from Seeking to Justify Directive 13 Because of the Decision in Black v. Rizzo?*

The collateral estoppel issue in this case arises from the decision of Judge John B. Hannum of this Court in Black v. Rizzo, 360 F.Supp. 648 (E.D.Pa.1973). That case involved a Philadelphia fireman's challenge, based on several constitutional and nonconstitutional grounds, of his dismissal for violation of the Department's hair length regulation previously in effect. In defense of the regulation, the Department offered two justifications: first, that the Department is a paramilitary organization with the power to regulate not only the dress but also the grooming of its members; second, that uniformity of appearance tends to instill public confidence in, acceptance of, and respect for the Fire Department. For some reason (we suspect a failure of advocacy), the Department did not offer safety as a justification.

The case was submitted to Judge Hannum on the pleadings, neither side offering any evidence. Judge Hannum sustained the plaintiff's *Stull* claim, and further held that (1) "the Fire Department does not have a valid interest in the maintenance of a military form of discipline over its members and further

---

27. Our conclusion that the regulation can withstand the less restrictive alternative rule, based, of course, on the evidence presented to us, in substantial measure results from the plaintiffs' failure to adduce evidence sufficient to sustain their burden of showing what specific alternative or alternatives are equally safe, feasible, and less restrictive. *See Stull, supra.*

that the qualified disciplinary interest it does possess does not encompass the regulation of grooming"; (2) the defendants' interest in presenting a uniformly groomed appearance to the public is valid but insubstantial and not entitled to much weight. The plaintiffs here argue that these two holdings are binding in this litigation on the paramilitary and public image arguments because of collateral estoppel. They further argue that *res judicata* bars the defendants from asserting the safety justification. Neither argument need detain us.

 The plaintiffs make a persuasive argument that the defendants are collaterally estopped by Judge Hannum's opinion in Black from asserting the paramilitary and public image arguments.[28] However, we have found

28. Collateral estoppel was recently discussed by the Third Circuit in Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840 (3 Cir. 1974). Judge Garth's opinion contains the following overview:

The doctrine of collateral estoppel precludes the relitigation of issues actually decided in former judicial proceedings. It is commonly recognized that the following three requirements must be satisfied before collateral estoppel may be utilized:

a) The issue decided in the prior litigation must be identical with the issue presented in the action in question;

b) The prior litigation must have resulted in a final judgment on the merits; and

c) The party against whom the estoppel is asserted must have been a party, or in privity with a party, to the prior adjudication.

494 F.2d at 844. The presence of these three requirements in this case is not open to serious dispute. The identity of the issues is in question only in that the hair regulation was changed after the decision in *Black* and before the plaintiffs here were first suspended. However, a reading of General Order 4, the regulation at issue in *Black*, together with Directive 13 shows that their language is virtually the same, though it appears in reorganized and reparagraphed form in the newer regulation. The finality of Judge Hannum's judgment is clear, even though the Department argued to us that the *Black* case was a settlement; the fact is that after Judge Hannum's decision on the merits of liability, the parties agreed on the amount of the plaintiff's damages and the City took no appeal. The identity of the party against whom the estoppel is asserted, the City Fire Commissioner, the City Managing Director, and the City, is the same. Neither does it matter, for collateral estoppel purposes, that there are different plaintiffs in the two cases, since the law of this Circuit is that:

Provided that the party against whom the plea is asserted has had a full and fair opportunity to present his claim in the prior litigation, collateral estoppel is available as a defense in this Circuit regardless of whether or not the party asserting the plea was a party (or privy) to the prior

litigation. *See* Bruszewski v. United States, 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); Township of Hopewell v. Volpe, 446 F.2d 167, 171 (3d Cir. 1971).

. . . In this Circuit, a total stranger to a prior litigation may, in a subsequent suit, estop a party from re-litigating a claim which he lost in the prior controversy, provided that the initial opportunity to present the claim was full and fair.

Scooper Dooper, Inc. v. Kraftco Corp., *supra*, 494 F.2d at 844-845.

The most difficult portion of the collateral estoppel argument relates to the question whether Judge Hannum's holdings in *Black* were findings of fact or statements of the law or a combination of the two. This is significant because collateral estoppel effect is given only to findings of fact or decisions on mixed questions of law and fact, not to conclusions of law. Scooper Dooper, *supra*, 494 F.2d at 845 n. 10. Ordinarily it would not be difficult to determine whether statements that the Philadelphia Fire Department has no valid interest in military discipline, and that the Philadelphia Fire Department's interest in presenting a uniform appearance to the public is valid but insubstantial, are mixed issues of fact and law, subject to the bar of collateral estoppel. Such a determination is complicated however by the fact that, in contrast to this case where a full record was developed on the paramilitary and appearance arguments, no record was developed before Judge Hannum, to whom the case was submitted solely on the pleadings.

The record in this case reveals that, in contrast to a policeman on patrol, who generally works by himself and whose acts of valor are ·generally the result of individual initiative, the functioning of a fire company on the fireground cannot countenance individuality. It is totally a military operation, with the men responding to commands from superior officers who have the overview of the fire situation and direct the battle against the fire much as a general does on a battlefield. In this situation, each man is dependent upon the efforts of the others, and absolute obedience to command is essen-

it unnecessary to reach the paramilitary and public image arguments in this opinion; hence the alleged effect of Black v. Rizzo is beside the point. The plaintiffs have not argued that there is a collateral estoppel with respect to the safety issue, even though the defendants were not deprived of the opportunity to litigate a safety justification before Judge Hannum; nor could such a contention prevail, because of the "actually litigated" requirement for collateral estoppel. *See* Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974); Murphy v. Landsburg, 490 F.2d 319, 321–322 (3d Cir. 1973); Gambocz v. Yelencsics, 468 F.2d 837, 841 (3d Cir. 1972).[29]

■ The plaintiffs' final argument (albeit raised only in a footnote and a letter to the Court, and not briefed by the plaintiffs) is that *Black* has *res judicata* effect on the entire question of the constitutionality of the regulation, including the safety issue. This argu-

ment is plainly incorrect. *Res judicata* does not preclude litigation of a subsequent case not between the same parties (or their privies) who were involved in the prior case. Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). *Black* was not a class action and so it adjudicated the rights of the named plaintiff only. Another way of looking at the same requirement is the rule stated in Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 811, 39 L. Ed.2d 9 (1974), that *res judicata* does not preclude the litigation of a different cause of action. Plaintiffs here have a different cause of action from the plaintiff in *Black* simply by virtue of their being different persons.

Having found that the Black opinion does not act as a bar, that Directive 13 is justified by considerations of safety, and that it is not unconstitutionally vague, our finding must be for the defendants.

tial. Indeed, Commissioner Rizzo testified that the firefighter's occupation is one of the few civilian jobs in which a man can be prosecuted criminally for cowardice. There is considerable authority upholding the paramilitary argument in cases where a police department grooming regulation was at issue. *See* Stradley v. Anderson, 478 F.2d 188 (8th Cir. 1973); Yarbrough v. City of Jacksonville, 363 F.Supp. 1176 (M.D.Fla. 1973); Akridge v. Barres, 118 N.J.Super. 557, 289 A.2d 270 (1972); Greenwald v. Frank, 40 A.D.2d 717, 337 N.Y.S.2d 225 (1972), aff'd mem., 32 N.Y.2d 862, 346 N.Y. S.2d 529, 299 N.E.2d 895 (1973). Although the arguments in support of the paramilitary justification for a fire department grooming regulation are forceful, there are countervailing considerations, not the least of which centers upon the reasonableness of the relationship between the grooming regulation and the maintenance of paramilitary discipline.

The fact that no trial was held in Black does not necessarily preclude collateral estoppel effect being given to its results. *See* Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 421 F.2d 1313, 1319–1320 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971), for a careful and lucid analysis of the use of collateral estoppel where there were no disputed "facts" to be "found" in the prior litigation. We of course cannot surmise what Judge Hannum's decision would have been

had there been a record before him. And, since it is not necessary that we decide whether there is a collateral estoppel as to the paramilitary and appearance justification arguments, we express no view as to whether Judge Hannum's conclusions in Black v. Rizzo are mixed conclusions of fact and law which give rise to collateral estoppel or conclusions of law which have precedential value alone.

29. As the Supreme Court noted in Sea-Land Services, Inc. v. Gaudet, *supra* at 819:
Collateral estoppel applies
"where the second action between the same parties is upon a different cause or demand . . . . In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' [Citations omitted.] Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated." Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).