Ronald J. AIELLO, Plaintiff,

v.

The CITY OF WILMINGTON, DELA-
WARE, et al., Defendants.

Civ. A. No. 74–216.

United States District Court,
D. Delaware.

Dec. 28, 1976.

John S. Grady and Sheldon N. Sandler of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

James W. Semple of Flanzer & Isaacs, Perry F. Goldlust, Asst. City Sol., Wilmington, Del., for defendants.

Roger P. Sanders of Prickett, Ward, Burt & Sanders, Wilmington, Del., for defendant Malloy.

OPINION

MURRAY M. SCHWARTZ, District Judge.

Ronald J. Aiello ("Aiello") is a former fireman for the City of Wilmington. He has brought this action on behalf of himself and "all other persons similarly situated" against the City of Wilmington, Delaware, and Thomas C. Maloney in his official capacity as mayor; the City's Department of Public Safety and Norman Levine, individually and as Commissioner of the Department of Public Safety; as well as against the Wilmington Bureau of Fire and several of its officers in either their individual or official capacities or both. The action seeks declaratory and equitable relief in addition to damages for the alleged deprivation through the Bureau of Fire's disciplinary rules, regulations, and procedures of rights secured by the First, Ninth and Fourteenth Amendments and 42 U.S.C. § 1983. Aiello also asserts a cause of action for himself and the purported class for breach of a contract between the firefighters union and the City, and for violation of the Delaware Minimum Wage Law, 19 Del.C. § 901 *et seq.*[1] Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331, 1337, 1343, and the principle of pendent jurisdiction.

Presently before the Court are three motions: a Motion to Certify Class by plaintiff Aiello; a Motion for Partial Summary Judgment, also by the plaintiff; and a Motion for Summary Judgment by defendants. It is first necessary to describe the factual context in which this case arises prior to a detailed consideration of the plaintiff's claims and the present motions.

*Facts*

Plaintiff Aiello was employed as a fireman for the City of Wilmington from June 3, 1966, until November 7, 1975, when he voluntarily took retirement. His career as a firefighter was essentially undistinguished until the night of January 30, 1973, when the catalytic events for this lawsuit transpired. Aiello spent that evening in Wilmington traveling from bar to bar, consuming alcoholic beverages in quantities sufficient to induce intoxication, although the level and duration of his intoxication is unclear. His memory of his activities that evening is hazy, but he does not dispute that sometime after midnight he gained entrance to the Record Museum, a retail establishment located on Wilmington's Market Street, by breaking a glass panel in its front door. He was subsequently found lying face down on the floor near a counter by two policemen sent to investigate an alarm which he had triggered. Aiello recalls that as he was taken into custody he stated he was a city fireman and asked that

---

1. Plaintiff also asserted in Count VII of his amended complaint a cause of action against the City under the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* However, he has since conceded by letter to the Court dated July 14, 1976, that a recent decision of the Supreme Court, *The National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), has effectively disposed of this claim. The Court concurs in this conclusion and will make no further reference to any of the plaintiff's Fair Labor Standards Act contentions throughout the remainder of this opinion.

he not be arrested. Aiello First Deposition, Docket No. 33 at 12.[2]

Following his arrest, Aiello was taken to the "lock up" in City Hall. The ranking fire bureau official then on duty, Assistant Fire Chief Francis H. DiMichele ("DiMichele") (named as a defendant in his official capacity) arrived shortly thereafter, having been notified that a fireman was in trouble. According to DiMichele, he "spoke to some of the police officers there" and ascertained the charge on which Aiello was being held. DiMichele Deposition, Docket No. 34 at 3. Having learned that the charge was burglary, DiMichele then confronted Aiello at least twice, seeking a statement concerning the incident. Although there are some minor disputes over the exact chronology and circumstances of the confrontations, it is clear that Aiello limited himself to a statement that "it was a physical and mental problem." First Aiello Deposition, Docket No. 33 at 6.[3] There is no dispute that DiMichele later returned and informed Aiello that he was forthwith suspended from the Bureau of Fire pursuant to sections 169.16 and 169.23 of its Rules and Regulations. They provide as follows:

"169. Under penalty of suspension, fine, overtime, reprimand, or dismissal, every member of the Bureau of Fire is ordered to perform all of the following Rules and Regulations:

\* \* \* \* \* \*

16. To refrain from conduct unbecoming a fireman and a gentleman whether on or off duty.

\* \* \* \* \* \*

23. Be governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens. Regardless of the time or place, whether in uniform or not, members shall conduct themselves in a manner that will not bring discredit to themselves or to the Department."[4]

Also, there is no dispute that as part of the suspension Aiello's pay was withheld in accordance with Bureau of Fire Rule 206.[5]

It is at this point that the recollections and assertions of the parties begin to diverge. While Aiello concedes a lack of personal knowledge of the matter, he asserts that his suspension was ordered by John J. Malloy ("Malloy"), named in this suit as a defendant in his official capacity, and serving at the time of Aiello's arrest as Chief of the Bureau of Fire. This assertion is apparently based on Aiello's understanding of the requirements of the Bureau's "chain of command." First Aiello Deposition, Docket No. 33 at 20. While Malloy admits that he was contacted by DiMichele about the events unfolding with respect to Aiello, he characterizes the conversation as only informational in purpose. Malloy Deposition, Docket No. 35 at 16–17. Neither Malloy nor Norman Levine ("Levine"), Malloy's su-

---

**2.** One of the arresting officers later testified that a search of Aiello's pockets revealed several rolls of coins with a total value of nine dollars and some bracelets of a type sold by the Record Museum. In addition, three eight track tapes and an empty money bag were found in the immediate area of the floor where Aiello was found. *See* Transcript of Aiello's Trial Board Hearing, Docket No. 53 (produced in response to a request for production by plaintiff and admissible pursuant to Fed.R.Evid. 803(8)). The arresting officer's contemporaneous report is attached as an exhibit to Defendants' Answers to Plaintiff's First Set of Interrogatories, Docket No. 29.

**3.** In response to an interrogatory questioning "whether plaintiff was given opportunity to explain his actions" prior to his suspension, Aiello responded in the negative:

"No. Chief DiMichele asked plaintiff if he wished to make any written statement.

Plaintiff answered that the matter was personal. Chief DiMichele then returned and suspended plaintiff[.]" Docket No. 40, # 14(f).

**4.** *See* Docket No. 31. A copy of the Rules and Regulations of the Wilmington Bureau of Fire was produced by the defendants in response to plaintiff's request for production.

**5.** *Id.* Rule 206 provides that:

"From the time of suspension the salary of the member so suspended shall be withheld pending the trial of the person suspended, and the Trial Board shall recommend to the Commissioner the disposition of the salary of the suspended member as well as its recommendation on the charge."

perior as Commissioner of Public Safety, countermanded the suspension the following day when afforded the opportunity to review the available information. Levine Deposition, Docket No. 64 at 50; Malloy Deposition, Docket No. 35 at 16; *see* Docket No. 29, Exhibits (Report from DiMichele to Malloy dated January 30th concerning Aiello's arrest and suspension).

Aiello by his own account was subsequently instructed in early February, 1973, by Bureau of Fire Chief Malloy to report to his fire station twice a day for the entirety of his suspension—a requirement then imposed on suspended firemen pursuant to regulation.[6] He further alleges that Chief Malloy warned him that outside employment was barred while on suspension, and that a subsequent request the following month (March, 1973) to James P. Blackburn ("Blackburn"), Malloy's successor as Fire Bureau Chief (named as a defendant in both his individual and official capacities), for relief from the ban on outside employment on the grounds that Aiello's financial position was becoming increasingly dire met with a negative response. Plaintiff's Answers to Defendants' First Set of Interrogatories, Docket No. 40 at 9. The second request, conveyed by Father Burke, the Department Chaplain, was assertedly followed by a third and personal request by Aiello for permission to undertake outside employment or apply for welfare. According to Aiello, this request was also rejected. *Id.* The defendants, for their part, do not deny that a Bureau of Fire rule required Aiello "to report to his assigned fire department twice each day until April 4, 1973, while he was under suspension." Answer to Amended Complaint, Docket No. 87, ¶ 11. However, they deny that he was ordered not to seek outside employment. *Id.* Commissioner Levine testified that if Aiello had requested permission not to report so that

he could obtain supplemental employment, it would have been granted. Levine Deposition, Docket No. 64 at 48.[7]

The distress to Aiello caused by his unpaid suspension and its alleged accompanying strictures may have been exacerbated by the unusually long hiatus between his suspension and his formal hearing before a Bureau of Fire Trial Board. While Aiello was suspended on January 30, 1973, his Trial Board hearing did not take place until May 8, 1973. According to Commissioner Levine and other defendants, the Trial Board hearing was held in abeyance pending resolution of the state criminal charges arising out of the Record Museum break-in which were then pending against Aiello. Levine testified on his deposition that the hiatus was based on a desire to protect Aiello's constitutional rights and was predicated on an informal oral opinion obtained from the then-City Solicitor to the effect that the Trial Board hearing should be delayed until the criminal charges had been resolved. Levine Deposition, Docket No. 64 at 47.

Notification of resolution of the criminal charges came in a letter dated April 11, 1973, from a Delaware Deputy Attorney General to Richard Allen Paul, an Assistant Public Defender and Aiello's attorney in the criminal matter. The letter stated that the State would proceed no further against Aiello because he "was not responsible for his acts on January 28, 1973 [sic]." Docket No. 29, Exhibit. Aiello subsequently received two "Charge and Specification" forms dated April 25th, signed by Assistant Chief DiMichele, which alleged violations of Rules 169.16 and 169.23 respectively. The detailed specification paragraph of the 169.-16 charge stated that Aiello's behavior reflected "on his creditability as an employee of the Department of Public Safety as required by the Rules and Regulations of the

6. *Id.,* Rules 169.10 and 221.

7. The twice daily reporting requirement for suspended firemen embodied in Rules 169.10 and 221 was rescinded by Chief of Fire Blackburn's General Order 73–9 dated April 4, 1973.

The General Order appears to contemplate the possibility of outside employment for suspended firemen in that it lays down requirements for notice to the department "immediately upon outside employment." Docket No. 29, Exhibits.

Bureau of Fire." [8] In a similar vein, the 169.23 charge noted, *inter alia,* that Aiello's "failure to observe rules of law-abiding citizens created distrust in performance of duty in the eyes of all members of the Department of Public Safety." [9] Both doc-

**8.** The Charge and Specification on Rule 169.16 provided as follows:

CHARGE AND SPECIFICATION PREFERRED AGAINST

FIREMAN RONALD J. AIELLO—ENGINE CO. #9 "A" PLATOON

CHARGE Failure to refrain from conduct unbecoming a fireman and a gentleman whether on or off duty.
In violation of Rule #169, Section #16 of the Rules and Regulations

SPECIFICATIONS

On January 30, 1973, at 12:55 A.M. Fireman Ronald Aiello was found inside the Record Museum located at 419 North Market Street by Officers of the Wilmington Bureau of Police.

Fireman Ronald Aiello failed to conduct himself in a manner conducive to good conduct and behavior. This unprofessional action reflects on his creditability as an employee of the Department of Public Safety as required by the Rules and Regulations of the Bureau of Fire.

TO APPEAR BEFORE THE TRIAL BOARD CONSISTING OF DEPUTY CHIEF F. MALLOY, PRESIDENT OF TRIAL BOARD, ASSISTANT CHIEF DI ORIO AND CAPTAIN SAVAGE IN CENTER CITY FIRE STATION CONFERENCE ROOM AT 8:15 A.M. ON TUESDAY, MAY 8, 1973."

**9.** The Charge and Specification on Rule 169.23 provided as follows:

CHARGE AND SPECIFICATION PREFERRED AGAINST

FIREMAN RONALD J. AIELLO—ENGINE CO. #9, "A" PLATOON

CHARGE Failure to be governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens.
In violation of Rule #169, Section #23 of the Rules and Regulations

SPECIFICATIONS

On January 30, 1973, at 12:55 A.M. Fireman Ronald Aiello was found inside the Record Museum located at 419 Market Street by Officers of the Wilmington Bureau of Police. Fireman Ronald Aiello did not govern himself by the customary rules of good behavior observed by law-abiding and self-respecting citizens, but instead, conducted himself in a manner that brought discredit both to himself and to the Department of Public Safety.

All members of the Bureau of Fire must at all times maintain the highest standard of respect for others, both in nature of trust and confidence. By being found inside the Record Museum, after they were closed for business, you have in the eyes of the public and department, placed an obstacle to total trust and confidence so urgently needed in our line of duty.

Above action has damaged the good name of the Department by failure to observe rules of law-abiding citizens,

uments informed Aiello of the composition of the Trial Board which was to hear the charges and recited the date and location set for hearing. Amended Complaint, Docket No. 83, Exhibit A. See Plaintiff's Answers to Defendants' First Set of Interrogatories, Docket No. 40, # 16.[10] In addition, Aiello received a formal memorandum from Chief Blackburn regarding the "forthcoming Department Trial," which restated the Rules and Regulations alleged to have been violated and notified him of his right to be represented by legal counsel and to subpoena witnesses for his defense. Amended Complaint, Docket No. 83, Exhibit A.

There is no clear explanation in the record as to why the Trial Board hearing was delayed for nearly a month after the criminal charges were dropped, although the defendants' brief infers from Commissioner Levine's deposition testimony that it was "arranged so as to meet with the convenience of Aiello's counsel." Defendants' Brief, Docket No. 71 at vii, citing Levine Deposition, Docket No. 64 at 51. Aiello's criminal defense attorney, acted as his spokesman at the Trial Board hearing. The Bureau of Fire was represented by an attorney from the City Solicitor's office. The Trial Board consisted of Deputy Chief Francis X. Malloy, a defendant in his official capacity; and Assistant Chief Francis DiOrio and Captain F. Thomas Savage— both named as defendants individually and

in their official capacities. At the hearing, Aiello entered a plea of not guilty to the two charges and specifications read to him by the Board, but did not contest the allegation that he had been found inside the Record Museum without permission. He argued in defense that the acts had not been performed with any intention or effect of violating the "high standard" required of firemen and had not brought discredit upon Wilmington's fire department. As the nature of Aiello's defense indicates, and as his legal spokesman specifically conceded to the Trial Board, the "not guilty" plea might have better been stated as "guilty with explanation." Trial Board Hearing Transcript, Docket No. 53 at 11. In addition to basically uncontroverted testimony by police personnel and Assistant Chief DiMichele concerning the circumstances of Aiello's arrest and suspension, the Bureau of Fire's legal representative introduced as exhibits two contemporaneous newspaper reports of the incident as evidence that there had been some resultant discredit to the fire department. Id. at 49.[11] Aiello himself also testified. The main import of Aiello's own testimony was that personal problems stemming from family conflicts had placed him under heavy emotional stress, resulting in excessive drinking and culminating in the Record Museum incident. He also offered medical evidence to show that his current mental condition was not such that he could not competently perform his duties

created distrust in performance of duty in the eyes of all members of the Department of Public Safety.

> TO APPEAR BEFORE THE TRIAL BOARD CONSISTING OF DEPUTY CHIEF F. MALLOY, PRESIDENT OF TRIAL BOARD, ASSISTANT CHIEF DI ORIO AND CAPTAIN SAVAGE IN CENTER CITY FIRE STATION CONFERENCE ROOM AT 8:15 A.M. ON TUESDAY, MAY 8, 1973."

---

**10.** Some unexplained confusion exists in the record concerning the charge and specification forms upon which the Trial Board proceeded. Those described above are dated April 25, 1973. They apparently superceded an earlier set also signed by DiMichele dated January 30th, prepared while criminal charges were still pending against Aiello, which charged violation of the same rules, but in which the specifications were couched in terms more attuned to a violation of the criminal law. For example, DiMichele charged that Aiello had violated Rule

169.₂.3 "when he wilfully committed a felony to wit burglary 4th, degree did break and enter the Record Museum located at 419 Market Street Wilm. with intent to commit larceny" thus bringing "discredit to himself and the Department." Defendants' Answers to Plaintiff's First Set of Interrogatories, Docket No. 29, Exhibits. Similarly, DiMichele's original January 30th report to Chief John J. Malloy was succeeded by a revised version addressed to Malloy's successor, James P. Blackburn and dated April 25, 1973.

as a fireman. It was additionally noted that he was undergoing therapy on an ongoing basis to prevent any similar occurrence.

After retiring for deliberations, the Trial Board found Aiello guilty on both charges. As punishment, the Board imposed the following sanctions: (1) that he be given one thousand hours penalty time on each of the two charges for a total of two thousand penalty hours; (2) that his salary be forfeited from the date of the suspension, January 30th, through the date of the hearing, May 8th; and (3) that he be reinstated as of May 9th but placed on probationary status until all penalty hours had been expended, with the stipulation that the probation period would not in any event be less than two years from May 9, 1973. Finally, the Board warned that any further violation of the two rule provisions under which he has been charged during the probationary period would result in his dismissal. *Id.* at 85–87; *see* Amended Complaint, Docket No. 83, Exhibit B.

In accordance with the Bureau of Fire's procedures, Aiello was permitted to choose whether to take the penalty hours as an outright suspension or to work them off without pay in concert with his normal paid duty hours. The record is unclear concerning the exact sequence of intervening events, but Aiello ultimately signed a document committing himself to work the penalty hours without pay. Plaintiff's Answers to Defendants' First Set of Interrogatories, Docket No. 40, # 18. The document also recited that Aiello understood the consequences of his suspension without pay (which had just ended) including the resultant loss of time credited toward pension eligibility, loss of pay for holidays while suspended, and pro rata reduction in his clothing allowance and vacation days. It further provided that Aiello agreed by his signature to work the penalty hours "when-

ever and wherever ordered to do so by the Wilmington Bureau of Fire." *Id.*, First Complaint, Docket No. 1, Exhibit B, page 3.

Aiello completed working a large portion of the penalty hours without pay prior to his retirement due to psychiatric disability in November, 1975. In the interim, on October 21, 1974, he filed the Complaint which initiated this lawsuit. That Complaint was succeeded by an extensively revised Amended Complaint filed with leave of the Court one year later on October 22, 1975. In it, seven causes of action are alleged:

*Count I*: That the "suspension procedure of defendants violates procedural due process in that plaintiff has been deprived of property and liberty without a pretermination hearing." Docket No. 83, ¶ 13.

*Count II*: "The Trial Board which considered the charges against plaintiff on May 8, 1973, and other Trial Boards of defendants are not impartial and therefore plaintiff and the members of his class have been denied a fair hearing in violation of the due process clause." Docket No. 83, ¶ 19.

*Count III*: "Rule 169.16 and Rule 169.23 are unconstitutional in that they constitute an invasion of privacy in violation of the First, Ninth, and Fourteenth Amendments and furthermore they are overly broad and vague in violation of the First and Fourteenth Amendments." Docket No. 83, ¶ 27.

*Count IV*: Bureau of Fire Rule 170.7, which bans gossiping about a member of the Department of Public Safety, and Rule 170.8 which prohibits criticizing an official action of a superior officer are unconstitutional in that they are vague and overbroad in violation of the First and Fourteenth Amendments." Docket No. 83, ¶ 31.[12]

---

**11.** Aiello's legal representative at the Board hearing conceded in comments to the Trial Board that the department had been held "in some disrepute" as a result of the articles, but noted that the newspapers had been unfair in neglecting to report the subsequent dropping of criminal charges by the State. *Id.* at 64–65.

**12.** The exact nature of plaintiff's objection to Rules 170.7 and 170.8 is somewhat confused. *See* p. 1294, n.56, *infra.*

*Count V* : The City is and has been in breach of its contractual agreement with the firefighters union of which the plaintiff and the members of the class are third party beneficiaries.

*Count VI* : This count, alleging violation of 29 U.S.C. § 206, has been conceded by the plaintiff. *See* p. 1275, n. 1, *supra.*

*Count VII* : "By its failure to pay plaintiff and the members of the class he represents for work required to be done by it, the defendant city has violated and is violating 19 Del.C. § 902 in that it has not and is not paying $1.60 per hour." Docket No. 83, ¶ 49.

These skeletal contentions will be fleshed out in considering the parties' motions below.

### Motion to Certify Class

The parties have charted a meandering and sometimes perplexing course in the litigation thus far. Several pleadings have been followed by partial amendments or outright withdrawals.[13] Some further modifications of the pleadings are found in the briefs. This has clouded the case's procedural posture and impeded efforts to define the parties' relevant contentions. It is noted in this connection that two of the four briefs filed with the Court on the pending motions were submitted prior to the filing of the Amended Complaint. None of the briefs treat in detail the significance of Aiello's voluntary retirement from the Bureau of Fire, although its effect was explored subsequently by the Court at oral argument.

The only outstanding Motion to Certify Class was filed almost four months prior to the date the present Amended Complaint was filed. It has presumably been superceded by the class action allegation found in paragraph 4(a) of the Amended Complaint which is couched in variant terms and encompasses a broader scope:

"All firemen except the named defendants employed by the City of Wilmington who have been or will be or are subject to suspension without notice or an opportunity for a hearing and all firemen except the named defendants who have been or will be or are subject to disciplinary action pursuant to Rule 169.16 and 169.23 and Rule 170.7 and Rule 170.8 and all firemen except the named defendants who have been or are subject to a hearing before the Trial Board by defendants and by all firemen except the named defendants employed by the City of Wilmington who who have been or will be or are subject to work without compensation."

Plaintiff has given the Court the following description of the claims and jurisdictional bases upon which he seeks to represent the class:

"First, plaintiff's class urges that the suspension procedure is violative of procedural due process. Insofar as the claim rests upon 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343, relief is sought against Messrs. Blackburn, Levine and Maloney in their official capacities only.

"Second, plaintiff's class urges that the Trial Board is inherently unfair and violates procedural due process. This claim rests on 28 U.S.C. § 1343 and 42 U.S.C. § 1983. Plaintiff's class is seeking: a) injunctive relief against Messrs. Blackburn, Levine, Maloney in their official capacities only; b) monetary relief against the City for all members who worked without pay or have been suspended as a result of a Trial Board hearing in an amount equivalent to the number of hours worked or suspended times the members' hourly rate of pay.

"Third, plaintiff claims that the class he seeks to represent has been deprived of its First, Ninth and Fourteenth Amendment rights by Rules 169.16 and 169.23. Rules 169.16 and 169.23 improp-

---

13. *See, e. g.,* Docket No. 15, Defendants' Notice to Withdraw Motion to Dismiss; Docket No. 38, Plaintiff's Motion to Certify Class; Docket No. 59, Plaintiff's Motion to Certify Class; Docket No. 61, Withdrawal by Plaintiff of Motion to Certify Class Filed on or about April 9, 1975; Docket No. 78, Plaintiff's Notice and Motion to Amend Complaint with Amendments.

erly infringe upon plaintiff's Civil Rights in violation of 42 U.S.C. § 1983. Plaintiff acknowledges that the City of Wilmington is not a person for purposes of 42 U.S.C. § 1983. Insofar as this claim is based upon § 1983, plaintiff is seeking injunctive relief against Messrs. Blackburn, Levine and Maloney in their official capacities only.

"Fourth, plaintiff's class attacks Rules 170.7 and 170.8 as violative of the First Amendment. Insofar as this claim is based upon 28 U.S.C. § 1343 and 42 U.S.C. § 1983, plaintiff's class is seeking injunctive relief against Messrs. Blackburn, Levine and Maloney in their official capacities only.

"If any member of the class has been penalized for violation of these regulations, or damaged by an illegal suspension said members of the class should receive incidental monetary relief subject, of course, to any available defenses. [Footnote omitted.]

"Fifth, plaintiff attacks the procedure whereby individuals are suspended or given an option to work without pay, as violative of the collective bargaining agreement, state, and federal law. Plaintiff's class alleges that this procedure is so unreasonable that it constitutes arbitrary and capricious conduct in violation of substantive due process. Insofar as this action is based upon 28 U.S.C. § 1343 and a denial of due process, plaintiff is seeking injunctive relief against Messrs. Maloney, Blackburn, and Levine in their official capacity only and compensatory relief against the City of Wilmington.

"Insofar as the action is based upon the collective bargaining agreement and state law, plaintiff's class is seeking compensatory damages against the City of Wilmington. Plaintiff is requesting that the Court take penddnt [sic] jurisdiction of the statutory and contract claims. [Footnote omitted.]

"The above summarizes all of the *class* claims and sets out the names of the defendants whom plaintiff alleges are liable." [Emphasis in original.] Plaintiff's Reply Brief and Answering Brief on Defendants' Motion for Summary Judgment, Docket No. 90 at 3–5.

The requirements for class action certification are found in Fed.R.Civ.P. 23(a):

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

A decision on whether the specific criteria of Rule 23(a)(4) have been met may not rest on the Court's prospective view of the case's merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Scott v. University of Delaware*, 68 F.R.D. 606, 609 (D.Del.1975). However, a court may consider whatever information exists in the record relating to the four threshold requisites for class certification.

1. *Numerosity*

Plaintiff concedes the Bureau of Fire has no more than approximately 250 members.[14] Only seven firemen including Aiello have been suspended without pay during the past five years. Three of the seven are no longer firemen.[15] Only four firemen including Aiello have been charged under Rule 169.16 during the past five years. Three other firemen, plus Aiello, have been charged with violation of Rule 169.23 over the same five year period.

---

14. *See, e. g.,* Plaintiff's Reply Brief and Answering Brief on Defendants' Motion for Summary Judgment, Docket No. 90 at 11.

15. Docket No. 57, # 4. No firemen have been suspended *with* pay according to defendants. Docket No. 57, # 5.

Charges under Rules 170.7 and 170.8 have been brought only once in the last five years against an individual fireman. As a counter to these insubstantial numbers, plaintiff points to the fact that over 100 firemen have appeared before the allegedly biased Trial Boards over the past five years and approximately 89 of those firemen have been either suspended or worked penalty hours.

Faced with these figures, I do not believe that plaintiff has met the numerosity requirement of Rule 23(a)(1). Even the largest of the numbers mentioned above would not necessarily render joinder or intervention impracticable. *See, e. g., Al Barnett & Son, Inc. v. Outboard Marine Corp.,* 64 F.R.D. 43, 49 (D.Del.1974) (and cases cited therein). Moreover, as a practical matter, "the number of class members who would seek to join the suit if class certification were denied would be far fewer than the numbers alleged," *id.,* perhaps as few as the handful of firemen suspended without pay or charged under the rules which Aiello challenges.

### 2. *Common questions of law or fact*

█ The constitutional propriety of various of the Bureau of Fire's regulations and procedures is placed in issue by the class as well as the individual claims contained within the Amended Complaint. As a consequence, there are common questions of law and fact.

### 3. *Typicality*

Substantial problems exist with respect to the third prerequisite of Rule 23(a): that Aiello's claims be typical of those of the class. Each fireman, and Aiello in particular, faces a different Trial Board, on different charges, and receives a variant penalty—albeit under the same general rules and procedures. As a result, the idiosyncratic nature of each hearing makes every disciplinary action virtually unique—a point further illustrated by the extreme facts of Aiello's case. *Cf. Paton v. LaPrade,* 524 F.2d 862, 875 (3d Cir. 1975).

█ A more serious typicality flaw arises out of a jurisdictional defect cognizable at this early stage in the proceedings. The Amended Complaint fails to allege the existence of the $10,000 jurisdictional amount in controversy for each member of the purported class. This allegation is necessary for the class to succeed in its effort to recover "compensatory damages against the City of Wilmington . . ." (Amended Complaint ¶ 50(g) at 13) because a "city" is not a person within the meaning of 42 U.S.C. § 1983 and therefore a damage award against it cannot be predicated upon a section 1983 cause of action. In this Circuit the Fourteenth Amendment presents a viable alternative base for an action arising out of the violation of constitutional rights, but jurisdiction for the action must be predicated upon 28 U.S.C. § 1331, the general federal question jurisdiction statute which requires an amount in controversy exceeding $10,000. This is in contrast to 28 U.S.C. § 1343, § 1983's companion jurisdictional statute, which requires no amount in controversy. *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3d Cir. 1974), *vacated on other grounds* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *Samluk v. City of Wilmington,* C.A. No. 75–139 (D.Del. March 11, 1976) (and cases cited therein). Moreover, the class members' claims may not be aggregated to make up the required amount, nor can they rely upon Aiello's individual $10,000 allegation to meet the $10,000 requirement of section 1331.[16] *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Rauch v. United Instruments,* 405 F.Supp. 435, 438 (E.D.Pa.1975). Thus, only Aiello may properly assert a constitutionally-based claim for monetary damages against the City, while the class' ability to obtain damages depends upon the Court's willingness

**16.** A review of Docket No. 57, Exhibit J, reveals that out of a total of 266 charges brought against firemen over the past five years, there have been no more than twelve penalties of 100 hours or more imposed for a single charge in addition to the two 1000 hour penalties which Aiello received.

to consider, in its discretion, entirely separate claims based largely on claims asserted under state law. Conversely, while the class may seek to enjoin the operation of certain of the Bureau of Fire's rules and practices, Aiello, as a former fireman, may not be in a position to request or gain that type of specific relief, especially with regard to regulations under which he never was and now never can be charged.[17]

Given differing trial boards, charges and penalties accompanied by the jurisdictional problems inhering in Aiello's prospects for monetary relief from a defendant against whom the remainder of a class most likely could not recover, it is concluded that the typicality requirement of Rule 23(a) has not been satisfied.

### 4. *Fair and Adequate Representation*

A subtle antagonism exists between Aiello's interests and those of the class which he seeks to represent. For example, as a former fireman, he is insulated from the consequences of his attempt to label the "election" of penalty hours worked without pay or simple suspension as nothing more than a Hobson's choice. However, active firemen in whose behalf Aiello presumably seeks to act could well take a different view of the system and oppose abolition of what might be perceived as a desirable option. This possible divergence of interests is underscored by the realization that only a handful of penalties have even arguably, remotely approached the severity of those meted out to Aiello.

A representation problem such as the one presented has its roots in the larger question raised by Aiello's status as a *former* fireman attempting to represent a class composed largely of current members of the Bureau of Fire. This need not be a fatal defect in all cases and has been permitted in several suits based on race or sex discrimination. *See, e. g., Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir. 1975); *Dickerson v. U.S. Steel Corp.,* 64 F.R.D. 351, 355 (E.D.Pa.1974); *Mack v. General Electric Co.,* 329 F.Supp. 72, 76 (E.D.Pa.1971). In *Wetzel,* the Third Circuit pointed out in the context of a Title VII suit that "[w]hether a party adequately represents a class depends on all the circumstances of the particular case [citation omitted]," noting that the fact that a person was no longer employed with the defendant company was only one of the circumstances to be considered on a Rule 23(a)(4) determination. *Id.* In *Wetzel,* neither the district court nor the Court of Appeals perceived any antagonism between the interests of the former and present female employees, all presumably victims of the same discrimination. The factual milieu in which this case arises, quite different than ones in which ongoing discriminatory practices based on broad categories of race or sex are alleged, creates a contrary perception which Aiello has been unable to dispel.[18]

Finally, one further consideration militates strongly against certification of a class in this action. If Aiello is successful on his individual claims, that success can be expected to redound collaterally to the benefit of the purported class. Such an eventuality would render superfluous a class action seeking primarily *injunctive* and *declaratory* relief. If, on the other hand, Aiello is not successful, it may be assumed either that Aiello's claims were not representative of the class in the first instance or that the class could not have prevailed in any event. *See duPont v. Woodlawn Trustees, Inc.,* 64 F.R.D. 16, 22 (D.Del.1974); *Ihrke v. Northern States Power Co.,* 459 F.2d 566, 572 (8th Cir. 1972); *District of Columbia Podiatry Society v. District of*

**17.** *See infra* pp. 1292–1293 for a discussion of Aiello's standing to raise certain of his individual claims. Creation of a more limited class or subclass of former firemen would not materially enhance Aiello's efforts to obtain a class certification since the numerosity of such a class would be even lower than that discussed *supra.*

**18.** In light of this conclusion, no discussion will be devoted to defendants' assertion that Aiello's psychiatric disability, the basis for his retirement from the Bureau of Fire, negatively affects his ability to properly represent the class.

*Columbia,* 65 F.R.D. 113, 144 (D.D.C.1974); *cf. Martinez v. Richardson,* 472 F.2d 1121, 1126 (10th Cir. 1973). *But see Fujishima v. Board of Education,* 460 F.2d 1355, 1360 (7th Cir. 1972). Failure in this instance to certify the class in no way prejudices the rights of the arguable class members whereas certification of a class whose representative's interests may not be consonant with the remaining class members is clearly prejudicial to the interests of the class.

For all of the reasons discussed above and in light of the over-all circumstances of this case, it is concluded that the plaintiff has not met the requirements for certification of a class pursuant to Rule 23(a) and furthermore that this case is not appropriate for certification as a class action.[19] The motion to certify the class is denied.

### Motions for Summary Judgment

Defendants have requested summary judgment without qualification,[20] while Aiello has moved for "partial summary judgment" on behalf of "himself and all others similarly situated" on three specific issues: (1) the constitutionality of the Bureau's suspension procedure; (2) the constitutionality of Rules 169.16 and 169.23; and (3) whether the putative choice between suspension and working without pay offered to firemen who receive penalty hours from a Trial Board violates state law and the provisions of the collective bargaining agreement between the City and the firefighters union. Two issues are added by Aiello's second brief, submitted after the filing of the motion and the Amended Complaint, in which he seeks summary judgment that Rules 170.7 and 170.8 are unconstitutional and that the Trial Board structure is inherently unfair.[21] Although the introduction to his opening brief indicates that the summary judgment motion is restricted "to those aspects of the case which clearly apply to the entire class," [22] in the absence of class certification, the Court will consider plaintiff's motion only to the extent that the issues which it raises survive.[23]

The standard to be applied on a motion for summary judgment pursuant to Fed.R. Civ.P. 56 is clear and will govern the resolution of the parties' motions:

"[S]ummary judgment is never warranted except on a clear showing that no genuine issue of any material fact remains for trial after considering the pleadings and proof in the form of depositions, affidavits, and admissions on file. In determining the presence of a disputed issue of material fact on motion for summary judgment, 'all inferences, doubts and issues of credibility' should be resolved against the moving party. *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir. 1972)." *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 24 (3d Cir. 1975); *see Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### Property Interest

Plaintiff alleges that his on-the-spot suspension by Assistant Chief DiMichele violated procedural due process in that he was "deprived of property and liberty without a pretermination hearing." [24] Turning first to the property claim, a threshold question arises as to whether Aiello at the time of suspension possessed any cognizable proper-

19. In light of this determination that the threshold requirements for the maintenance of any class action have not been met, there is no need to resolve the question of whether the action could have been maintained pursuant to Rule 23(b)(1), (2) or (3).

20. Docket No. 62.

21. Docket No. 90 at 13.

22. Docket No. 67 at viii.

23. A question arose at oral argument as to whether plaintiff might have desired to shift his position to urge that all of his individual claims had been encompassed by the motion. However, in the absence of a formal pleading to that effect, the motion will not be extended beyond the bounds of the formal pleading and accompanying briefs.

24. Docket No. 83, ¶ 13.

ty interest entitled to due process protection.

■ The presence of a property interest is not normally of constitutional dimension. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *accord Bishop v. Wood*, 426 U.S. 341, 343, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (ultimate arbiter of "the sufficiency of the claim of entitlement [to a property interest is] . . . state law"). Although there is no direct pronouncement of Delaware statutory or decisional law concerning a public employee's claim of entitlement to continued employment, prediction of Delaware law on this question is not particularly difficult. *Cf. Cofrancesco v. City of Wilmington*, 419 F.Supp. 109 at 111 (D.Del. 1976). Despite defendants' protestations to the contrary, a property interest clearly can be found in Aiello's acknowledged status as a permanent employee entitled to continue in his job absent violation of specific rules.

According to defendant Blackburn, Bureau of Fire Chief, a fireman is deemed to be a permanent employee, not susceptible to dismissal without cause, after successful completion of an initial six month probationary period.[25] The Chief further conceded upon questioning that Aiello was a "permanent employee" at the time of the events giving rise to this lawsuit.[26] Moreover, the permissible causes for a suspension of a

permanent fireman pending Trial Board Action are not so nebulous as to make his job dependent on the Bureau's "will and pleasure."[27] Rule 40 of the Bureau's Rules and Regulations authorizes suspension from duty pending the action of the Trial Board of any Bureau member "who has violated any Law, Ordinance, or Rules or Regulations. . . ."[28] Finally, all of the Bureau's Rules were incorporated by reference into the collective bargaining agreement between the firefighters union and the City of Wilmington which was in effect at the time of Aiello's suspension, Docket No. 83, Exhibit C, Article XXIII, it being well established that a property interest such as the one claimed in this case "can be created by an express contract, a clearly implied promise . . . or administrative standards. . . ." *New Castle-Gunning Bedford Educ. Assoc. v. Board of Educ.*, 421 F.Supp. 960 at 963 (D.Del.1976), *citing Morris v. Board of Educ.*, 401 F.Supp. 188, 208 (D.Del.1975).[29] Moreover, collective bargaining agreements by public employers are expressly authorized by state law. 19 Del.C. § 1301 *et seq.*

■ The collective bargaining agreement, the Bureau's own Rules and Regulations, and the uncontroverted understanding of the Bureau of Fire Chief support Aiello's assertion that the security of his position was not subject to whimsical vagaries of any sort, but vulnerable only on specified grounds shown through pre-ordained procedures. In this context, Aiello's interest in his continued employment was accorded such a high degree of recognition

---

25. Blackburn Deposition, Docket No. 88 at 22-23.

26. *Id.*

27. *Bishop v. Wood, supra.*

28. Rule 40 reads in full as follows:
"40. He [the Bureau of Fire Chief] may suspend from duty pending the action of the Trial Board, any member of the Bureau of Fire who has violated any Law, Ordinance or Rules and Regulations when, in his opinion, it is for the best interest of the Bureau of Fire. A written report of the suspension, together with a full statement of the facts

pertaining thereto, must be filed in duplicate, immediately with the Commissioner of Public Safety."

29. *See also Bishop v. Wood, supra*, 426 U.S. at 343, 96 S.Ct. at 2077, ("[a] property interest in employment can . . . be . . . created . . . by an implied contract"); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) ("[a] person's interest in a benefit is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support his claim of entitlement to the benefit . . . .").

that it rose to the level of one entitled to constitutional protection.[30]

This conclusion is not altered by the defendants' interpretation of *Bishop v. Wood, supra.* Defendants urge that *Bishop* permits this Court to construe the collective bargaining agreement (as authorized by state law), the Bureau's Rules and Regulations, and other data supporting Aiello's expectancy of a property interest "as granting no right to continued employment [at all,] but merely conditioning [the] employee's removal [up]on compliance with [the] specified procedures."[31]

It is indisputable that the district court in *Bishop* adopted this stance in granting the defendants' motion for summary judgment against the plaintiff, a policeman discharged without a hearing who claimed that his employment status was a property interest entitled to due process protections. "Based on his understanding of state law, he [the district judge] concluded that petitioner 'held his position at the will and pleasure of the city.'" 426 U.S. at 345, 96 S.Ct. at 2078. The Supreme Court accepted the lower court's interpretation of North Carolina law in which the lower court had considerable expertise, noting that the interpretation was tenable and had been concurred in, albeit narrowly, by the court of appeals. "These reasons are sufficient to foreclose our independent examination of the state law issue." *Id.* at 347, 96 S.Ct. at 2079. *Bishop's* acceptance of the lower court's construction of North Carolina law does not require a similar construction of Delaware law as applied to facts completely different from that found in *Bishop v.*

*Wood, supra.* The fact that North Carolina state law does not accord North Carolina public employees a property interest in their continued employment in no way forecloses the finding of a property interest in the case of the present Delaware plaintiff.

As a back-up argument in its effort to characterize *Bishop* as a radical departure from previous law, defendants further assert that "Bishop suggests that due process is satisfied by following the procedures set forth in the statute, ordinance, or contract allegedly conferring the right."[32] This is, in essence, the theory advanced in Mr. Justice Rehnquist's plurality opinion in *Arnett v. Kennedy,* 416 U.S. 134, 153–54, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974): "[W]here the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." If the *Bishop* court intended to adopt the *Arnett* plurality position, one would think it would have so indicated. In the absence of any meaningful statement to that effect, such portentous meaning should not be read into *Bishop's* unassuming language. The Court in *Bishop* did not recognize some hybrid form of "bittersweet" right. It merely acquiesced in the district court's holding that plaintiff had no property interest at all. In so doing, *Arnett* was properly distinguished as a case in which six members of the Court had found a property interest in the fact that plaintiff could only be discharged for cause. 426 U.S. at 345 n.8, 96 S.Ct. 2078. *Bishop,* on the other hand, presented a situation in which the district court's "holding

---

**30.** One way in which defendants have attempted to refute the existence of this cognizable property interest is by arguing that Aiello's failure to exhaust the administrative appeal avenues afforded him by the Bureau's Rules and Regulations and the collective bargaining agreement deprives this Court of jurisdiction to entertain Aiello's claims. This argument is not persuasive. At a minimum, it is clear that such exhaustion is not required where, as has been alleged here, resort to administrative remedies would have been futile. Moreover, exhaustion is not an indispensable requirement even in the absence of futility. *See Hochman v. Board of*

*Education,* 534 F.2d 1094 (3d Cir. 1976); *cf. O'Brien v. Galloway,* 362 F.Supp. 901, 906 (D.Del.1973).

**31.** Letter from defense counsel dated July 16, 1976. *Bishop v. Wood* was handed down almost two months subsequent to the oral argument on the parties' motions, sparking an exchange of views between counsel addressed to the Court concerning the impact of that case on the instant matter.

**32.** Letter from defense counsel dated July 16, 1976.

that as a matter of state law the employee 'held his position at the will and pleasure of the city' necessarily establishes that he had *no* property interest." *Id.* The plurality opinion in *Arnett,* rejected by a majority of the Court in *Bishop,*[33] is left in its previous non-controlling posture. *See Muscare v. Quinn,* 520 F.2d 1212, 1216 n.4 (7th Cir. 1975), *cert. dismissed as improvidently granted,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976); *Mattern v. Weinberger,* 519 F.2d 150, 160 n.20 (3d Cir. 1975); *but cf. Bishop v. Wood, supra,* 426 U.S. at 353–362, 96 S.Ct. 2074 (White, J. dissenting).

### Liberty Interest

Although Aiello's assertion of infringement of a liberty interest stands on less secure footing than his property claim, it is doubtful whether this claim can be resolved on a motion for summary judgment. Assuming the current viability of a liberty interest based on damage to reputation and impairment of plaintiff's ability to seek other employment,[34] serious factual questions remain unresolved on the present record as to whether the defendants were responsible for the alleged deleterious effects which the suspension, Trial Board charges and the subsequent adjudication on them may have had.[35] While Aiello proffers the two newspaper accounts of his Record Museum arrest as examples of such deleterious effects, the defendants argue that the articles focus on the "police-blotter" story inherent in the burglary arrest, rather than on Aiello's suspension from the Bureau of Fire.[36] Aiello also references Rule 220, which requires a decision of the Trial Board to be read at all Bureau of Fire Roll Calls in addition to mandating that the decision be made part of the fireman's service record. However, any damage to Aiello engendered by the dissemination of the Trial Board adjudication of guilty on both charges may possibly be attributed to Aiello's own admission to the actions which brought on the charges. The damage to his reputation and opportunities for employment, if any, may have resulted from the nature of his acknowledged actions rather than from the Trial Board's determination that the actions were violative of two Bureau rules. Nor is there conclusive evidence in the record to indicate whether and how the mandates of Rule 220 were carried out. These disputes are illustrative of the uncertainty in the present record concerning whether the damage to Aiello's liberty interests, if any, was self-inflicted, how the damage was ultimately manifested,[37] and the manner and degree in which the defendants contributed to that damage. The present incomplete record coupled with the nature and origin of the alleged infringement make summary judgment singularly inappropriate on Aiello's claims of deprivation of a liberty interest without due proc-

**33.** The Third Circuit has yet to speak directly on the meaning of *Bishop* other than to offer a few words of cryptic guidance in its most recent opinion in *Skehan v. Board of Trustees,* 538 F.2d 53, 63 (3d Cir. 1976):

"We also call the district court's attention to the Supreme Court's recent decision in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), a decision considering or perhaps reconsidering the scope of the protection afforded public employment by the due process clause. We leave it to the district court in the first instance to decide whether or to what extent that decision bears upon this litigation."

**34.** The current validity of this assumption is questionable. *Compare Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) *and Goss v. Lopez,* 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) *with*

*Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *see Bishop v. Wood, supra,* 426 U.S. at 351 n.1, 96 S.Ct. 2074 (Brennan, J. dissenting).

**35.** *See Bishop v. Wood, supra,* 426 U.S. 347, 350, 96 S.Ct. 2074; *Paul v. Davis, supra.*

**36.** See Docket No. 29 Exhibits (newspaper articles). The Court also notes in this context that there is general agreement that at the time of his arrest Aiello himself announced his status as a fireman and asked not to be arrested.

**37.** *Compare Velger v. Cawley,* 525 F.2d 334, 335 (2d Cir. 1975), *cert. granted,* 427 U.S. 904, 96 S.Ct. 3188, 50 L.Ed.2d 1197 (1976) (stigma clearly manifested itself in foreclosure of employment in both public and private sectors).

ess. Final resolution of this claim must be deferred until trial.

### The Suspension

Even if it can be established (or assumed) that Aiello was imbued with a constitutionally-protected property interest and possibly a liberty interest at the time of his suspension, this Court still would be obliged to grant defendants' motion for summary judgment if convinced that Aiello had been accorded the requisite due process guaranteed by the Fourteenth Amendment. In determining whether he had been deprived of his constitutionally-protected property and liberty interests in a manner not comporting with the due process protections of the Fourteenth Amendment, three distinct factors must be considered:

> "[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e. g., Goldberg v. Kelly,* [397 U.S. 254, 263–71, 90 S.Ct. 1011, 1018–1022, 25 L.Ed.2d 287 (1970)]." (*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Even conceding that Aiello's private interests in, *inter alia,* unbroken employment and a clean record are not de minimus, no violation of due process can be found in the manner and timing of his suspension. Although his suspension was not attended by a formalistic observance of procedural niceties, there were present the rudiments of due process. By Aiello's own account, Assistant Chief DiMichele confronted him at least twice seeking a state-ment clarifying the circumstances of his arrest. Aiello made only a limited response to the effect that the matter was a physical and mental problem. He has acknowledged that he was drunk on the evening in question and that he "was wiped out" and "wasn't functioning." [38] Viewing the facts in a light most favorable to Aiello, he was either unwilling or too incapacitated to respond to DiMichele's questions concerning the "problem" which apparently brought him to the Record Museum after hours culminating in his arrest. Either circumstance placed the Bureau of Fire and Assistant Chief DiMichele in an untenable position. Due process does not require a governmental bureau charged with the protection of life and property to retain a member on active duty in the face of indications that he may be a danger to himself, others, or their property when the member, upon informal confrontation, fails to proffer an explanation or scintilla of reassurance concerning the situation in which he is found. The concept of due process has never been inflexible, and leaves sufficient ground for summary action in extreme situations. The possibility of a "continuing danger to persons or property," *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), outweighs the interests which might have called for delay. *Compare Muscare v. Quinn, supra,* 520 F.2d at 1216 (fireman suspended without prior process for violation of a regulation); *Anapol v. University of Delaware,* 412 F.Supp. 675 at 680 (D.Del. 1976) (University professor terminated for falsifying documents).[39]

However, this determination does not necessarily end the due process inquiry. While a rudimentary confrontation may satisfy the dictates of due process for the purpose of a short suspension in an "emergency" case, more may be required prior to an extended unpaid suspension of the type Aiello underwent.

---

**38.** Docket No. 33 at 99.

**39.** This conclusion should in no way be construed as a blanket endorsement of Rule 205 which permits temporary suspension, pending final hearing of a fireman accused of violating a Rule or Regulation when the suspension is judged to be in the best interest of the Department of Public Safety. Rather, it is limited to the "emergency" facts of the present case.

*Delay Between Initial Suspension and Hearing*

Aiello ultimately received a Trial Board hearing, and apart from his claim concerning the alleged bias of its members, to be discussed *infra,* he does not complain of the procedural safeguards which he was afforded. His complaint centers upon the lengthy gap between the date of his suspension, January 30th, and the date of his Trial Board hearing, May 8, 1973. Aiello's contention is that the initial confrontation could not and did not satisfy the minimum due process requirements necessary to justify a 98 day suspension, during which time he was admittedly unpaid and allegedly under instructions not to seek outside employment. He further argues the hearing could not retroactively satisfy the demands of due process.

The interplay between temporal delay and denial of due process is significant. However, case law addressing the issue in the form that it has taken in this case is scarce. In most cases the issue is framed and decided in terms of the constitutionality *per se* of the *procedure* which permitted or sanctioned the delay of the hearing, and not whether the delay viewed in the particular circumstances considered resulted in a denial of due process. The issue in the instant matter encompasses the latter: whether due process delayed is due process denied. Or more formally put, two questions are presented: (1) can a mere delay in providing a hearing rise to the level of a constitutional deprivation if the hearing, when finally provided, otherwise procedurally satisfied the requirements of due process; and (2) if so, on the facts of this case, did the delay of 98 days from the time of Aiello's suspension until the hearing imper-

missibly deny Aiello his right to due process?

An analysis of the first question must start with the premise that the fundamental requirement of due process is the opportunity to be heard "at *a meaningful time* and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (emphasis added). Elaboration on this general principle has been forthcoming on a number of occasions by both the Supreme Court and lower federal courts. In the context of a suspension of a student from public school for no more than ten days, for which notice and a rudimentary hearing followed rather than preceded the actual suspension (as occurred here), the Supreme Court held the student was entitled to the necessary notice and rudimentary hearing "*as soon as practicable,*" following the actual suspension.[40] *Goss v. Lopez,* 419 U.S. 565, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (emphasis added).

In another factual context, the Supreme Court was confronted with a lower court decision invalidating certain Connecticut procedures sanctioning pre-hearing suspension of unemployment compensation benefits. While vacating and remanding for reconsideration in light of intervening state law changes, the Supreme Court clearly shared the lower court's concern about the role of delay in the context of the overall scheme of due process:

> "Prompt and adequate administrative review provides an opportunity for consideration and correction of errors made in initial eligibility determinations. Thus, the rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process." *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975).[41]

---

**40.** The primary holding of *Goss* was that even for student suspensions from public schools of no more than ten days, due process required notice and a rudimentary hearing. Although the Court preferred that the notice and hearing precede the suspension, it did recognize that when the continued presence of a student "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process," 419 U.S. at 582, 95 S.Ct. at 740, then the hearing could permissibly follow the sus-

pension. The Court also indicated without further elaboration that suspensions of longer duration may require "more formal procedures." *Id.* at 584, 95 S.Ct. 729.

**41.** Admittedly the significance of the lower court holding in *Fusari* was somewhat eroded by *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), in which the Supreme Court held termination of disability payments under the Social Security Act prior to an

Finally, in *Muscare v. Quinn,* ·520 F.2d 1212 (7th Cir. 1975), *cert. dismissed as improvidently granted,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976), the Seventh Circuit held that a fireman suspended for 29 days without a prior hearing for claimed violations of departmental hair regulations was denied due process of law.[42]

 Although these decisions addressed the constitutionality *per se* of suspension or termination procedures, their language and reasoning support the conclusion that timing nonetheless is an important element of due process. Nor should such a conclusion be surprising since the basic right which the courts have been seeking to protect is the right to a hearing "as soon as it is practicable" after a suspension has occurred, when legitimate considerations have excused the failure to provide a hearing prior to the actual suspension. However, this timing component of procedural due process, where a suspension precedes a hearing, must of necessity be flexible. A finding of a constitutional deprivation should be made after consideration of such factors as (1) the actual duration of delay between the suspension and hearing; (2) the degree of potential deprivation resulting from the suspension; (3) the adequacy of administrative review procedures utilized prior to the suspension; (4) the adequacy of the post-suspension hearing with concomitant time constraints and restraints; and (5) the extent to which the individual suspended contributed to or otherwise knowingly and wilfully acquiesced in ·the delay.[43]

 Whether Aiello was accorded a hearing as soon as was practicable after his suspension in this case involves essentially a factual determination. It is undisputed that for most of the suspension period Aiello was required to report to his fire station twice a day—a requirement which in itself might have precluded opportunities for outside employment even in the absence of a specific directive to that effect. On the other hand, Commissioner Levine contradicted Aiello's assertion that he was told not to seek other employment by stating that Aiello would have been permitted to seek outside employment if the request had been made. In addition, the present record leaves unclear whether all or part of the delay between the suspension and the Trial Board hearing may have been at the behest of Aiello or his counsel—or at least with their acquiescence in light of the pendency of criminal charges arising out of the same incident. The record finally suggests an inference that the particular delay between dismissal of the state criminal charges and the Trial Board hearing may have occurred in part to accommodate the schedule of Aiello's legal representative at the hearing. These disputed issues preclude summary judgment for any of the litigants. A mature resolution of the factual issues raised here must await trial. Yet, some of those issues are sufficient to demonstrate that serious deprivations of Aiello's due process rights may have been implicated in the chronology of his suspension and Trial Board hearing.

---

evidentiary hearing does not violate the requirements of due process. However, the administrative review procedures which had to be satisfied before the termination could be effectuated greatly exceeded the "seated interview" in *Fusari* and the confrontation between Assistant Chief DiMichele and Aiello in the present case. Moreover, as the Court in *Mathews* observed in evaluating the significance of a delay, "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decision-making process." 424 U.S. at 341, 96 S.Ct. at 906, *citing Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In Aiello's case the degree of deprivation was extremely high; he was for all intent and purposes deprived of what was his

present source of income and possibly precluded from pursuing alternate sources of employment.

**42.** *See also Moody v. Daggett,* 429 U.S. 78, 95, 97 S.Ct. 274, 283, 50 L.Ed.2d 236 (1976) (Stevens, J. dissenting) ("[d]elay will therefore violate the ' . . . fundamental requirement of due process . . . .' "); *Johnson v. Anderson,* 370 F.Supp. 1373, 1380 (D.Del.1974) (Stapleton, J.) ("when the reason for the emergency exception to the hearing requirement is no longer apposite, the exception is no longer apposite").

**43.** The above listing is in no way intended to be exhaustive.

### Trial Board Bias

■ Aiello attacks the impartiality of the Trial Board which considered the charges against him on two grounds. One is more individual in nature, resting on an alleged bias on the part of at least one member of the Trial Board which heard Aiello's case, Thomas Savage, and on the part of his superiors, Chief Blackburn and Commissioner Levine.[44] While this allegation may appear somewhat ironic in light of the virtual admission by Aiello's counsel at the Trial Board hearing that his plea was, for all practical purposes, one of "guilty with explanation," the operative facts are sufficiently in dispute at least in regard to the penalty which the Board imposed to render summary judgment on this point inappropriate.[45]

■ Similar restraint is not required with regard to the second ground of Aiello's bias allegation. It is based on a tenuous chain of reasoning: Trial Boards are made up of senior members of the Bureau of Fire picked by the Bureau Chief; the Boards frequently impose penalty hours; firemen frequently "work off" their penalty hours without pay; the "free labor" gained by the Bureau through the imposition of penalty hours constitutes an incentive for their imposition by the members of the Board. Aiello contends that free labor from a penalized fireman such as himself assists the Bureau of Fire in remaining within its budget and eases the overall responsibilities of the senior officers. According to Aiello, this is the type of temptation which the Supreme Court found to signify a lack of due process in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). There the Monroeville mayor, with wide executive authority and responsibility for the village finances, also served as a judge with power to levy fines for violation of ordinances and traffic offenses. Assuming *arguendo* that *Ward's* due process standard for mayors functioning as *judicial* officers in a *court* of law is controlling in this essentially administrative setting, its teaching has not been violated. The bias interest alleged here is far less direct than that found in *Ward,* especially in light of the absence of an allegation that the members of the Trial Board bear any responsibility for the Bureau of Fire's budget.[46] Even under the rigorous standard operative on a motion for summary judgment, viewing the facts and reasonable inferences arising from the record in the light most favorable to Aiello, his allegations of Trial Board bias based on *Ward* are as a matter of law too attenuated to fall within its purview. Cf. *Withrow v. Larkin,* 421 U.S. 35, 47 and n.14, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (and cases cited therein); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). *See generally Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

### Rule 169.16, 169.23: Vagueness and Overbreadth [47]

■ While they may not be models of precision, Rules 169.16 [48] and 169.23 [49] be-

**44.** Docket No. 41, # 21.

**45.** Aiello believes based on second-hand information that Savage took part in the investigation of his case prior to sitting on the Trial Board which adjudicated it. There is, however, barely a scintilla of support for this belief in the present record. *See* Docket No. 33 at 50, 53. Aiello further alleges encounters with Savage after the Trial Board hearing which, if factual, would lend substance to his allegation. *See, e. g.,* Docket No. 40, # 17.

His bias allegations against Levine and Blackburn stem partly from an encounter prior to the Trial Board hearing in which an officer in the Bureau suggested that he resign. Aiello believes that the remark was instigated from above. *Id.* at 31, 51-52.

**46.** Carried to its logical extension, Aiello's arguments might require the importation of outside adjudicators in every disciplinary case since lower-ranking firemen arguably could be presumed to suffer from analogous impairments of judgment stemming from competitive jealousies in a Bureau where promotions may be hotly contested.

**47.** Aiello challenges these two rules in a dual capacity: as an individual charged under them, and as an individual who was living under the rules (but not further charged with a specific violation) after the Trial Board hearing. This section will discuss the former; the latter is discussed *infra* at pp. 1294-1295 in the section on "chill."

A close reading of Aiello's contention that the two rules unconstitutionally infringed his

**48, 49.** Notes 48 and 49 on page 1293.

long to a genre not unknown in the realm of public employment, particularly with reference to the uniformed services.[50] Their imprecision may admit of a successful constitutional challenge on vagueness grounds, but Aiello's individual attempt to do so, based on the circumstance of the charges brought against him, cannot succeed. The conduct which precipitated his suspension falls within the narrow category of acts so egregious that, despite any protestations to the contrary, he could have had no doubt that they were proscribed.[51] In his posture, as the perpetrator of "hard cord conduct which any reasonable person must know would be cause for discipline or dismissal from employment," Aiello has no standing to challenge Rules 169.16 and 169.23 for vagueness.[52]

Aiello's claim that Rules 169.16 and 169.-23 are overbroad must also fail. One of the few exceptions to the general rule that an individual may not assert the rights of others in challenging the propriety of statutory or administrative prohibitions applied to him has been etched by the Supreme Court in the realm of First Amendment activities. As the Court explained in *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973):

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. [Citations omitted.] As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' *Dombrowski v. Pfister* [380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)]. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before this court to refrain from constitutionally protected speech or expression." [53]

Aiello's assertion that Rules 169.16 and 169.23 are overbroad fails to satisfy the prerequisites for overbreadth consideration in two respects. First, it is questionable whether his conduct fell within the purview of First Amendment activities, the cornerstone of the overbreadth doctrine. More

right of privacy discloses that it is nothing more than a reformulation of his vagueness and overbreadth objections. Accordingly, it is not separately addressed.

**48.** See p. 1276, *supra.*

**49.** See p. 1276, *supra.*

**50.** At least as applied to uniformed employees such as police and firemen, rules of this type may derive from military origins. *See e. g., Arnett v. Kennedy, supra; cf. Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Bence v. Breier,* 501 F.2d 1185, 1194–95 (7th Cir. 1974) (Jameson, D. J., concurring in part, dissenting in part).

**51.** *See Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Herzbrun v. Milwaukee County,* 504 F.2d 1189, 1193 (7th Cir. 1974); *Allen v. City of Greensboro,* 322 F.Supp. 873 (M.D.N.C.1971), *aff'd,* 452 F.2d 489 (4th

Cir. 1971); *Compare Bence v. Breier, supra,* 501 F.2d at 1193. *Cf. Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

**52.** *Herzbrun v. Milwaukee County, supra,* 504 F.2d at 1193; *see Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Parker v. Levy,* 417 U.S. 733, 754–57, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Michini v. Rizzo,* 379 F.Supp. 837, 850–51 (E.D.Pa.1974), *aff'd,* 511 F.2d 1394 (3d Cir. 1975) (judgment order); *Allen v. City of Greensboro, supra; Paulos v. Breier,* 507 F.2d 1383 (7th Cir. 1974); *cf. Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

**53.** *See also Parker v. Levy, supra; Herzbrun v. Milwaukee County, supra,* 504 F.2d at 1197–98 (Stevens, J., concurring); *Paulos v. Breier, supra.*

importantly, even if his claim colorably involved First Amendment rights, facial invalidation by application of the overbreadth doctrine is inappropriate if the provision in question applies to a "substantial number of situations to which it might be validly applied," *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974), or if the overbreadth is not real and substantial, "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma, supra,* 413 U.S. at 615, 93 S.Ct. at 2918; *accord, CSC v. Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). There is little doubt that in the present case Rules 169.16 and 169.23 legitimately apply to a substantial amount of conduct or number of activities which properly may be proscribed, and the overbreadth, if any, of the rules is marginal.[54]

*Rules 169.16, 169.23, 170.7, 170.8: Chill*

Aiello has also asserted that following the Trial Board hearing, he was "forced to live under the chilling umbrella of [Rules 169.16 and 169.23]"[55] as well as under Rules 170.7 and 170.8.[56] In particular, he claims that the regulations (under which he no longer lives) had an "inhibiting" effect upon his private, personal conduct and in his relations with his family, in addition to making him reluctant to avail himself of the Bureau of Fire's post-Trial Board appeal procedures or to complain in either public or private about his treatment by superior officers.[57] Weighing against these claims is the bare fact that Aiello was never charged with a violation of any of these rules subsequent to his Trial Board experience despite his admitted engagement in activities which come within the letter or spirit of his allegations of a chilling effect. The description of a pall cast over his life by operation of the regulations is just not consonant with his own deposition testimony concerning his activities during the probationary period. For example, his once monthly night of drinking while on probation[58]—the very activity which by his own admission had precipitated his prior difficulties—saps the force of his "chill" complaint. Moreover, despite his broad assertion of a fear to appeal his Trial Board sentence, Aiello admits sending a letter to Chief Blackburn several months after the Trial Board hearing requesting payment for the time during which he was suspended.[59] In addition, it is clear that he did not hesitate in attempting to enlist the firefighters union's assistance in his behalf.[60]

In order to prevail on a claim of "chill" concerning protected First Amendment activities and speech,[61] a party must

---

**54.** This is not to say that there may not be isolated instances in which the Rules improperly restrict protected First Amendment activities. The express holding is only that application of the overbreadth doctrine is not appropriate given the circumstances of this case.

**55.** Plaintiff's Reply Brief, Docket No. 90 at 30.

**56.** Rules 170.7 and 170.8 are contained in a section labeled "Acts Forbidden" and provide that:

"170. Under penalty of suspension, fine, overtime, reprimand, or dismissal, every member of the Bureau of Fire is forbidden to be guilty of violations of any of the Rules and Regulations governing the Bureau of Fire:

. . . . .

7. Gossiping about a member of the Department of Public Safety concerning either his personal character or conduct to the detriment of the member.
8. Criticizing the official action of a superior officer."
The exact nature of plaintiff's objection to Rules 170.7 and 170.8 is somewhat unclear. In the amended complaint, the objection is stated to be one of overbreadth and vagueness. Docket No. 83, ¶ 31. In Plaintiff's Reply Brief, Docket No. 90 at 46–49, the objection is labeled and substantively argued as one of unconstitutional chill. Since plaintiff has never been charged with violating either rule, it is appropriate to treat plaintiff's objection as one of chill, rather than that of overbreadth and vagueness, which are applicable when the challenging party actually has been charged with a violation of the provision in question.

**57.** Docket No. 83, ¶¶ 25–27, 30.

**58.** Docket No. 91 at 12.

**59.** *Id.* at 19.

**60.** *Id.* at 21.

**61.** Many of the specific instances of chill alleged by Aiello, e. g., that he refrained from (1) playing the stereo too loud (Docket No. 91 at 5); (2) arguing with or correcting his children (*Id.*); (3) getting involved in controversies with his

first establish that it has suffered actual injury or harm. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972); *accord Paton v. LaPrade,* 524 F.2d 862, 873–74 (3d Cir. 1975); *cf. O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Given this requirement, Aiello's vague allegations of subjective chill, perhaps questionable on their face, and further undermined by his testimony which documented the absence of a specific inhibiting effect exerted by the Rules on his activities, are insufficient to sustain a claim of unconstitutional chill.[62] Accordingly, defendants' motion for summary judgment on this issue is granted.[63]

### The State Law Claim

Count V of plaintiff's Amended Complaint alleges that certain activities of the Bureau of Fire with respect to Aiello, including the "requirement" that he work penalty hours without pay, were in violation of the collective bargaining agreement between the City and the firefighters union. Count VII alleges that the failure to pay plaintiff for penalty hours worked was in violation of 19 Del.C. § 902. Resolution of the contract questions raised under Count V is essentially a matter of state law.

Similarly, Count VII will require the Court to engage in interpretation of a state statute with little guidance from the state courts on knotty issues such as whether the statute is applicable to the City of Wilmington, a public employer. Since these issues are pendent to Aiello's federal claims, they need not be considered at all if the Court, in light of principles of comity, declines to hear them, and, in any event, *may* not be considered unless they arise from a "common nucleus of operative facts." *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Here, the common nucleus is uncertain since, although the general milieu is the same, the facts necessary to a resolution of the "federal" constitutional claims can form a discrete package separate from those directly relevant to the state law claims. In addition, there is not present any reason to venture forth upon uncharted state law waters where the voyage is not required. Such incursions into the domain of unsettled state law are best left to the state courts in the first instance, particularly where they do not entail federal constitutional considerations. *See Trivits v. Wilmington Institute,* 417 F.Supp. 160 (D.Del. 1976); *cf. Cofrancesco v. City of Wilmington,* 419 F.Supp. 109 (D.Del.1975). Therefore, the Court will decline to take pendent jurisdiction of Counts V and VII of the Amended Complaint.[64]

neighbors (*Id.*); (4) adulterous conduct (*Id.* at 11); and (5) "Kitchen talk" (use of vulgar language) (*Id.* at 17–18) do not even constitute the types of expression for which the First Amendment was primarily intended as a guarantor.

**62.** *Philadelphia Yearly Meeting v. Tate,* 519 F.2d 1335 (3d Cir. 1975), cited by plaintiff, is clearly distinguishable on its facts. There, nonsubjective harm sufficient to support standing was found in respect to concrete police *actions* involving surveillance and dissemination of surveillance information. Here, the harm, so far as it existed at all, can be found only in Aiello's subjective apprehensions.

**63.** Alternatively the Court possibly could have treated defendants' motion for summary judgment as a motion to dismiss for want of subject matter jurisdiction under F.R.Civ.P. 12(b)(3) and dismissed plaintiff's claim either for want of a justiciable controversy or want of stand-

ing. *See Laird v. Tatum, supra; Paton v. LaPrade, supra.* Nevertheless the Court is convinced that a decision on the merits is appropriate since matters outside of the pleadings (and affidavits) have been considered, unlike the situation in *Laird v. Tatum.*

**64.** To the extent plaintiff contends that imposition of penalty hours violates federal constitutional strictures, this assertion is erroneous. *See Ahearn v. DiGrazia,* 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976), *summarily aff'g* 412 F.Supp. 638 (D.Mass.1976). Implicit in the Court's holding that application of a penalty hour sanction to some but not all types of municipal employees does not violate the Equal Protection Clause of the Fourteenth Amendment is the determination that imposition of penalty hours is not itself inconsistent with constitutional requirements.

### Punitive Damages

██ A plaintiff is not entitled to an award of punitive damages unless there is "an indication of bad faith by the defendants sufficient to justify such an award." *Rappaport v. Little League Baseball, Inc.*, 65 F.R.D. 545, 548 (D.Del.1975). While the defendants argue that the present record is devoid of the required indication of bad faith, this cannot be said to the certainty required on a motion for summary judgment. Therefore, the issue of whether punitive damages may be appropriate on any of the causes of action remaining in the case must be held in abeyance pending trial.

### Official Immunity

██ The individual defendants have argued strongly that they are entitled to official immunity with respect to the actions complained of by Aiello. The prevailing Third Circuit view of official immunity for state non-judicial officials was set forth in *Skehan v. Board of Trustees*, 538 F.2d 53 (3d Cir. 1976) (en banc), which in turn relied extensively on *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Skehan* the Third Circuit indicated that in order to avail himself of the official immunity defense, the burden was on the state official to make the dual showing: (1) that he acted without malice or the awareness that his conduct violated the plaintiff's rights, and (2) that he did not know, nor reasonably should have known that his conduct violated the constitutional rights of the party affected. *Skehan, supra,* 538 F.2d at 60-61. Although there is some language in *Skehan* suggesting that *Wood's* application only would be appropriate in the context of school officials, the subsequent discussion of immunity is couched in more general terms, indicating an intended broad application of the principles enunciated. Moreover, a recent opinion by Judge Stapleton in this District applied a *Skehan*-type analysis in the context of a damage suit against a prison official. *Johnson v. Anderson,* 420 F.Supp. 845 (D.Del.1976). Since the record as it presently stands contains numerous factual doubts and disputes regarding both showings mandated by *Skehan,* it is not possible for the Court to rule on the immunity issue at the summary judgment stage of these proceedings.

### Conclusion

A number of questions by both parties have been submitted to the Court for consideration. Plaintiff's Motion for Class Certification and Plaintiff's Motion for Partial Summary Judgment are denied. Defendants' Motion for Summary Judgment is denied except as to the following enumerated particulars. Without passing on plaintiff's claims that the actual suspension and the actual composition of the Trial Board in this case denied him his constitutional rights, defendants' Motion for Summary Judgment is granted as to plaintiff's general claims that the suspension procedure is unconstitutional per se and that the Trial Board system of review is inherently biased. Defendants' Motion for Summary Judgment also is granted as to certain of plaintiff's allegations that Rules 169.16 and 169.-23 are unconstitutional; this Court holding that as a matter of law the Rules are not unconstitutionally overbroad and that Aiello has failed to demonstrate the presence of any actual chilling effect of his First Amendment right of expression. Aiello's claim that Rules 169.16 and 169.23 are vague is dismissed for want of standing. Finally, Aiello's failure to demonstrate an actual chill also results in the granting of summary judgment in favor of defendants on Aiello's claim that Rules 170.7 and 170.8 unconstitutionally chilled his First Amendment right of expression.

Submit order on notice.